INTERNATIONAL DIAMOND IM-
PORTERS, LTD., the Engagement
Store, Inc. and J. Robert Goldstein,
Appellants

v.

SINGULARITY CLARK, L.P., Appellee.

Superior Court of Pennsylvania.

Submitted Jan. 23, 2012.
Filed March 22, 2012.

Howard R. Lehman, Pittsburgh, for appellants.

Bart M. Beier, Pittsburgh, for appellee.

BEFORE: GANTMAN, J., WECHT, J., and McEWEN, P.J.E.*

OPINION BY WECHT, J.

Appellants International Diamond Importers, Ltd., The Engagement Store, Inc., and Robert Goldstein (collectively "Appellants") appeal the trial court's order entered June 7, 2011. That order, entered after a five-day trial, granted Appellee Singularity Clark, L.P. ("Singularity"), a directed verdict on Appellants' claim for breach of contract and a non-suit as against Appellants' claim for tortious interference with contractual relations.[1] Appellants also challenge an evidentiary ruling that they claim adversely affected their remaining claims for conversion and negligence, which went to a jury solely as a negligence claim[2] and resulted in a defense verdict.

We affirm the verdict as to negligence. However, because we find that the trial court misapplied governing legal standards to the record before it, and further abused its discretion with regard to critical aspects of the breach of contract and tortious interference claims by denying the jury the opportunity to pass on disputed questions of fact that were material to those claims, we reverse. Accordingly, we remand for a new trial on those claims.

* President Judge Emeritus McEwen did not participate in the consideration or decision of this case.

1. The non-suit was entered following Appellants' case-in-chief.

2. Appellants pleaded separate counts for conversion and negligence. However, at the close of evidence the trial court determined that these counts comprised one negligence claim and consolidated them for the jury's consideration. Notes of Testimony at 485,

### Factual Background and Procedural History

The trial court offered the following summary of the case's factual background:

[This matter] arises out of a commercial lease of Suites 201A, 204W and 205 on the second floor of the Clark Building [in downtown Pittsburgh].[3] International Diamond Importers, Ltd., ("IDI"), the Engagement Store, Inc., ("Engagement") and Robert Goldstein, ["Goldstein"] known collectively as the [Appellants,] . . . operated retail jewelry stores until early 2003 when Goldstein held a retirement liquidation sale. Since the retirement liquidation sale Suites 201A, 204W and 205 have remained closed to the public.

In July 2006, Singularity Clark ["Singularity"] purchased The Clark Building from Hoban Realty, L.P. ["Hoban"]. The lease agreement between Hoban Realty and IDI and Engagement and thereafter between IDI and Engagement and [Singularity], provided[ ]that tenants would be in breach of the lease for 201A if it abandoned or vacated the premises; and in breach of 204W–205 if it failed to open or keep the premises continuously or uninterruptedly open for business each business day.

Once the Plaintiffs closed the doors in 2003, they remained closed and remained dark until December 2006.

R.R. at 491a. Before this Court, Appellants raise no objection to the trial court's decision in this regard. For clarity, hereinafter, we refer to these merged claims simply as a "negligence" claim.

3. As set forth below in detail, the suites in question were subject to two leases, each of which was amended at least once. For clarity, we refer to the lease for suite 201A as the 201 Lease. We refer to the lease for suites 204W and 205 as the 204–205 Lease.

Trial Court Opinion (T.C.O.), 6/6/2011, at 1–2.

On or about October 17, 2006, Singularity transmitted a letter to Appellants purporting to furnish "notice" that, within 90 days, Singularity intended to "exercise its right to relocate" the businesses in, and all contents of, suites 201A, 204W, and 205 from the second floor to suites on the fourth floor of the Clark Building. Singularity Clark Letter to Robert Goldstein, 10/17/2006, Reproduced Record (R.R.) at 535a. The letter did not aver that Appellants had breached the leases corresponding to those suites; did not cite lease provisions establishing Singularity's right to relocate; and did not suggest that the relocation was in lieu of, or a step toward, termination of the leases. On or about November 17, 2006, Appellants responded by letter disputing Singularity's authority to relocate Appellants' business. International Diamond Importers Letter to Ira Gorman, Singularity Clark, 11/17/2006, R.R. at 536a–37a. Following this exchange, Appellant Goldstein visited the Clark Building on November 20. He testified that he proceeded to work in his Clark Building office for four full days. Notes of Testimony at 168–170 (N.T.), R.R. at 174a–76a.[4] Thereafter, between November 24, 2006, and Appellant Goldstein's next visit on December 20, 2006—and hence shy of the 90 days that Singularity's notice promised—Singularity forcibly entered Appellants' suites and relocated Appellants' property into storage on the second and/or fourth floors. N.T. at 170–71, R.R. at 176a–77a.

Following the relocation of their property, Appellants filed a complaint in the court of common pleas alleging two counts of breach of lease; one count each of conversion and negligence arising from the

alleged disappearance during the relocation of silver coins worth approximately $50,000; and one count of tortious interference with contractual relations. The latter count arose from alleged interference with Appellants' prospective sale of their business(es) and assignment of their Clark Building leases to Uri Hakami, an Israel-based American citizen who had known and done business with Appellant Goldstein for many years, and who sought to purchase a retail diamond business in the United States. In preliminary objections, Singularity contended, *inter alia,* that Appellants had materially breached and repudiated the leases by failing to maintain an open retail business in the assigned suites and by failing to maintain the premises in a neat, clean, orderly condition. Preliminary Objections in the Nature of a Demurrer and Brief in Support Thereof, 5/16/2007.

Singularity's objections were overruled. The case proceeded to trial. Following Appellants' presentation of their case-in-chief, Singularity moved for non-suit on all of Appellants' claims. The trial court granted non-suit on Appellants' tortious interference with contractual relations claim, but denied Singularity's motion as to the other counts. Specifically, the trial court ruled that Singularity had "no knowledge" of Appellants' discussions with Mr. Hakami, the purported buyer, and expressed doubt that "Uri would have passed muster on the creditworthiness." N.T. at 348, R.R. at 354a. This last aspect of the court's ruling was based upon its reading of the identical assignment-related amendments to both leases, which, as we discuss below, are facially ambiguous. The court explained: "[T]hese things are not freely alienable like you're selling widgets. If

4. Although trial spanned five days, the trial transcript is paginated continuously from the start of trial to its end. For clarity, we omit the dates of testimony and rely solely on the transcript's pagination.

you want to assign that contract, you do it with the approval of the landlord, which he's going to give—I suppose the law would say he cannot reasonably withhold, but he has a right to see your creditworthiness." N.T. at 348–49, R.R. at 354a–55a. Thus, the court concluded that approval was required for assignment; that such approval could not unreasonably be withheld; and that the landlord would be entitled to see particular evidence of creditworthiness before permitting assignment.

Following the close of evidence, the trial court revisited whether Appellants had stated claims upon which relief could be granted for breach of contract and negligence. As for breach of contract, the court ruled that Appellants themselves were in material breach, such that any breach by Singularity was not actionable. *Id.* The court thus entered a directed verdict on that claim, ruling that there were no disputed issues of material fact to submit to the jury as to breach of contract. N.T. at 485–89, R.R. at 491a–95a. As set forth above, *supra* n. 2, the court opted to submit Appellants' separate conversion and negligence claims to the jury solely on a negligence theory, without objection by the parties. N.T. at 485, R.R. at 491a.

Following deliberation on the remaining negligence claim, the jury returned a defense verdict. The jury found that Appellants had been 100% contributorily negligent, and that Appellants' negligent failure

to secure or remove the silver coins had proximately caused the alleged loss of $50,000 in those coins. This appeal followed.

Appellants raise the following issues for our consideration:

1. Did the Court err in directing a verdict against appellants on their breach of contract claim?

2. Did the Court err by entering a nonsuit on appellants' claim for tortious interference with contractual relations?

3. A. Did the court err in denying appellants' objection to questioning J. Robert Goldstein relating to default under the prior lessor's lease, and at the same time not allowing him to discuss the settlement agreement pertaining thereto?

 B. Did this error impact the jury appraisal of J. Robert Goldstein's character?

Brief for Appellant at 3 (*verbatim* ).

■ Appellants' first and third issues challenge the grant or denial of directed verdict or judgment notwithstanding the verdict (JNOV).[5] Appellants challenge, in their first issue, the grant of a directed verdict to Singularity on the breach of contract issue. In their third issue, they challenge the trial court's refusal to enter JNOV in Appellants' favor on the jury's defense verdict on negligence. According-

---

5. Although Appellants' third issue, as stated, is not framed as a challenge to the court's denial of Appellants' motion for JNOV, that indeed is the thrust of their corresponding argument. Following trial and verdict, Appellant sought JNOV on the basis that those errors complained of in issue three prejudiced the jury, thus compromising the verdict. Our procedural rules require an appellant to state each issue presented in a way that anticipates the corresponding substantive argument, Pa. R.A.P. 2116(a), and Appellants' failure to conform to our rules in this regard could be

construed as a basis to find the issue waived. Pa.R.A.P. 2101. However, Appellants preserved the issue before the trial court; the trial court ruled on its merits; and Singularity does not contend that the issue is waived on this or any other basis. Accordingly, we address the issue on its merits. *See* Pa.R.A.P. 107, cmt. (cross-referencing, *inter alia*, Pa. R.C.P. 126, which provides that a court "may disregard any error or defect of procedure which does not affect the substantial rights of the parties").

ly, we begin by setting forth the standard of review that this Court applies to challenges implicating both directed verdicts and judgments notwithstanding the verdict:

> Our standard of review when considering motions for a directed verdict and [JNOV] are identical. We will reverse a trial court's grant or denial of a judgment notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.
>
> There are two bases upon which a [JNOV] can be entered[:] one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that, even with all factual inferences decided adverse[ly] to the movant, the law nonetheless requires a verdict in his favor. Whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Janis v. AMP, Inc.*, 856 A.2d 140, 143–44 (Pa.Super.2004) (internal quotation marks and citations omitted). We address Appellants' third issue—pertaining to their negligence claim—first.

### *Conversion and the Exclusion of Rehabilitation Evidence*

■ In their third issue, Appellants challenge the trial court's ruling barring Appellants from introducing evidence detailing their settlement agreement with the prior landlord, Hoban. That settlement had resolved a separate dispute that arose before Singularity acquired the Clark Building from Hoban. Appellants contend that the trial court should have granted them judgment notwithstanding the jury's defense verdict on their negligence claim. The jury found that Appellants were 100% causally negligent for the loss, and hence could not recover.[6] Appellants argue that the jury was irreparably tainted when the court permitted Singularity to adduce testimony from Appellant Goldstein of the underlying default, but did not permit Appellants to rehabilitate Mr. Goldstein by reference to settlement details. Brief for Appellants at 17–18.

Our standard of review of evidentiary rulings is narrow:

> When we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party. A party suffers prejudice when the trial court's error could have affected the verdict.

*Reott v. Asia Trend, Inc.*, 7 A.3d 830, 839 (Pa.Super.2010) (citations and internal quotation marks omitted).

At trial, Singularity was permitted to question Appellant Goldstein regarding the alleged misconduct underlying the dispute with Hoban. *See* N.T. at 201, R.R. at 207a. Appellants contend that Singularity's cross-examination of Appellant Goldstein regarding the Hoban dispute entitled Appellants to a corresponding opportunity

---

**6.** The jury heard testimony supporting that conclusion to the effect that Appellant Goldstein had not secured the coins in the safes he had on the premises, nor in a safe deposit box he maintained. We need not flesh out this discussion, as Appellants do not contest the sufficiency of the evidence of contributory negligence.

to rehabilitate Appellant Goldstein by reference to the terms of the settlement reached between Appellants and Hoban. Appellants maintain that the trial court ruling precluding such rehabilitation tainted the jury's perception of Goldstein and compromised the verdict. Brief for Appellant at 17–18.

The trial court permitted limited mention of the settlement agreement, solely to the effect that Appellants had been granted "free rent" in the amount of $37,989.00 by Hoban to settle the dispute. T.C.O. at 7; *see* N.T. at 149, R.R. at 155a. The trial court refused to permit the admission of evidence that Singularity had knowledge of that settlement. T.C.O. at 7. The trial court maintains that its partial exclusion of such evidence did not taint the jury.

We need not take up the trial court's exclusion of evidence as such, because the evidence appears to us to be irrelevant to Appellants' negligence claim. Appellants do not develop a meaningful argument to the contrary. We cannot discern how the preclusion could have tainted a jury that attributed the loss to Appellants' contributorily negligent failure to secure the property at issue, for which conclusion the jury had adequate supporting evidence. *See, e.g.,* N.T. at 206–09, R.R. at 212a–15a (Appellant Goldstein testifying to his prior storage of the coins in a safe deposit box, but his decision not to do so prior to their alleged disappearance, and his inability to fit them into the safes in his suites).

We find that the trial court did not abuse its discretion in denying Appellants' motion for JNOV regarding the negligence claim. Accordingly, we affirm the trial court's ruling denying Appellants' motion for JNOV.

### Directed Verdict: Breach of Contract

■ We reach a different conclusion, however, with regard to the trial court's rulings granting Singularity a directed verdict on Appellants' breach of contract claim. We set forth above our standard of review of a trial court's decision to grant or deny a directed verdict. Like the trial court, we must view the record evidence in the light most favorable to the non-moving party. However, we must review the trial court's application of that standard for an abuse of discretion or an error of law.

Several factual matters bear on the directed verdicts and non-suit. First, the parties dispute whether Singularity had a basis under the leases for unilaterally relocating Appellants to the fourth floor from the second. The 201 Lease contained no provision or amendment pertaining to the question. The 204–205 Lease as amended authorized such a relocation solely in the event that 70% or more of the second floor was let to a single tenant, a contingency that Singularity has at no time asserted occurred. *See* 204–205 Lease, Amendment, art. 27, 10/30/1997, R.R. at 586a.

The trial court ruled that Appellants could not recover for Singularity's breach of the lease because Appellants' prior breach was so serious that it went to the "heart and essence" of the contract. The court found that Appellants' abandonment and failure to maintain a going retail business rendered their breach incurable, and freed Singularity from any duty of performance. T.C.O. at 3–4 (citing *LJL Transportation, Inc., v. Pilot Air Freight Corp.,* 599 Pa. 546, 962 A.2d 639 (Pa.2008)).

Appellants argue that Singularity failed to provide notice of the alleged breach or an opportunity to cure—an opportunity to which, they contend, the leases entitled them. Brief for Appellants at 9–10. Appellants emphasize that the only correspondence they received from Singularity concerned Singularity's intent to relocate Appellants' business from the second floor to the fourth, a less desirable floor for a retail jewelry business. Brief for Appel-

lants at 9–10 (citing N.T. at 243–45, R.R. at 249a–51a).[7] Appellants contend that the letter notifying Appellants of the relocation made no reference to breach or termination. Our review confirms the accuracy of this claim. *See* Singularity Clark Letter to Robert Goldstein, 10/17/2006, R.R. at 535a. Even assuming that the notice of relocation was consistent with either lease's requirements, Appellants argue, the relocation breached the leases, because the conditions specified in the 204–205 Lease permitting such a unilateral move had not been met, and because the 201 Lease contained no relocation provision at all. Brief for Appellant at 8, 10; *see* 201 Lease, R.R. at 597a.

Appellants also argue that the leases as amended authorized them to use the suites for "any lawful purpose," including, *inter alia*, as offices or storage space. Brief for Appellants at 11–12; *see* Amendment to 204–205 Lease, 4/10/1999, ¶ 3, R.R. at 594a ("Notwithstanding anything to the contrary in the Lease, Lessee shall be permitted to use the Premises for any legal use, including but not limited to, marketing

purposes and/or for use as a lounge where food and drink may be served by Lessee at no charge to its customers."); 201 Lease, ¶ 9.A., R.R. at 598a ("Lessee shall utilize the leased premises for the purpose of **a jewelry business and for any other lawful business purpose, subject to Lessor's approval, which shall not be unreasonably withheld.**" (emphasis reflects words typed into the form lease)). *But see* 201 Lease, ¶ 9.E., R.R. at 598a ("Lessee shall neither abandon nor vacate the leased premises during the term of this lease.").[8]

Appellants argue finally that other tenants on the same floor were "dark," which goes to the "materiality" of their alleged breach. They maintain that the question of whether any given breach rises to the stringent standard applied by our Supreme Court in *LJL Transportation* should be entrusted to the jury rather than decided as a matter of law by the trial court.[9]

Notwithstanding the trial court's and the parties' focus upon our Supreme Court's decision in *LJL Transportation,* we be-

---

7. Appellants' citation to the transcript does not support the proposition that the second floor properties were significantly more desirable than those on the fourth. That being said, Mr. Hakami, the prospective assignee of Appellant Goldsteins' leases, did so testify, providing adequate evidence for a jury to find that to be the case as a matter of fact. N.T. at 68–70, R.R. at 74a–76a; *see also* N.T. at 440, R.R. at 446a (tenant Linda Bucci–Reuter testifying that the fourth floor was less valuable for a retail jewelry business than the second).

8. We acknowledge that ¶¶ 9.A. and 9.E. of the 201 Lease, being to some extent redundant and inconsistent, must be reconciled, even if strictly as a question of law. The trial court fails to indicate that it made any such determination, however, and we leave it to the trial court to do so, if necessary, upon remand.

9. Appellants also argue that Singularity "waived" any claim or defense for breach of contract by accepting the terms of Appellants'

settlement in taking ownership of the Clark Building from Hoban. Appellants assert that the settlement allegedly resolved the conduct alleged by Singularity to constitute a breach by Appellants. Brief for Appellants at 12–14. Implicitly, this amounts to a further objection to the court's refusal to admit evidence of Appellants' settlement with Hoban. Appellants' reliance on *Samuel J. Marranca Gen. Contracting Co., Inc., v. Amer. Cherry Hill Assoc. L.P.,* 416 Pa.Super. 45, 610 A.2d 499 (1992), is unavailing. In that case we held that "waiver may be established by a party's express declaration or by a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary." *Id.* at 501. Given the trial court's skepticism regarding Singularity's awareness of the settlement with Hoban, Appellants cannot establish "acts or language so inconsistent with a purpose to stand on the contract provisions" as to leave no room for a contrary inference.

lieve that reliance to be misplaced. In *LJL Transportation,* our Supreme Court considered for the first time under what circumstances "a party's conduct in breaching a contract may justify its immediate termination, **even if the contract includes an express provision granting the breaching party the right to cure before the contract is terminated.**" 962 A.2d at 641 (emphasis added).

In *LJL Transportation,* a franchisee to an air freight concern sought damages for breach when the franchisor terminated the parties' contract without satisfying the contract's express notice and opportunity to cure provision. The franchisor established that the franchisee had breached several provisions of its contract with the franchisor, by, *inter alia,* diverting shipments to a non-franchisor company. *Id.* at 642–43. The franchisor argued that the appellants' "systematic scheme to defraud [the franchisor] could not be cured because it resulted in a destruction of the trust existing between the parties, which was a necessary component of their relationship as franchisor and franchisee, and constituted a breach of the fundamental essence and purpose of their contractual relationship." *Id.* at 646.

Our Supreme Court agreed. The Court acknowledged the time-honored rule that a party "may not insist upon performance of the contract when he himself is guilty of a material breach of the contract." *Id.* (citing *Ott v. Buehler Lumber,* 373 Pa.Super. 515, 541 A.2d 1143, 1145 (1988)). But the novel issue in *LJL Transportation* was not the effect of material breach generally, but rather the effect of the notice and cure provision on the application of the uncontr-

oversial general rule that a "material breach" relieves the non-breaching party of its duty of performance.

We find *LJL Transportation* considerably less apposite to the instant case than other precedents. The parties herein do not dwell on any lease provisions analogous to the express notice and cure provision at issue in *LJL Transportation.* Moreover, the Court held in *LJL Transportation* that the presence of such a provision does not necessarily bind a non-breaching party to honor its terms in the event of material breach.[10] Indeed, it does not appear to us that the "materiality" of the breach, in itself, was the principal issue before the *LJL Transportation* Court. The question, rather, was whether the relatively uncontroversial materiality of the breach at issue relieved the non-breaching party of compliance with a notice and cure provision.

In this case, by contrast, that circumstance is reversed: Singularity defends against Appellants' action for breach of contract on the basis that the materiality of Appellants' breach effectively terminated the contract. Appellants, in response, allude only in passing to the leases' notice and cure provisions. Instead, Appellants argue: a) that Singularity's breach in relocating them without authority warrants a remedy, and, in rebuttal to Singularity's defense of material breach, b) that Appellants did not breach either lease, materially or otherwise.

For these reasons, we focus on Pennsylvania's extensive body of caselaw addressing when a breach is sufficiently

---

**10.** The *LJL Transportation* Court found further support for its ruling in a contract provision providing that the contractor's "election to exercise any remedy available by law or contract shall not be deemed a waiver of nor preclude exercise of any other remedy." *Id.* at 647. The leases at bar contain similar provisions. *See* 204–205 Lease ¶ 31.1, R.R. at 564a ("All rights and remedies of Landlord herein enumerated shall be cumulative, and none shall exclude any other rights or remedies allowed by law or in equity."); 201 Lease ¶ 23, R.R. at 599a (materially equivalent language).

material to entitle the non-breaching party to cease performance. *See generally Widmer Eng. Inc. v. Dufalla,* 837 A.2d 459, 467–68 (Pa.Super.2003); *Gray v. Gray,* 448 Pa.Super. 456, 671 A.2d 1166, 1172 (1996); *Jennings v. League of Civic Orgs. of Erie County,* 180 Pa.Super. 398, 119 A.2d 608, 611 (1956). While a "material breach" relieves a non-breaching party of its obligation to perform, our law also is clear that "executed contracts cannot be rescinded or annulled ... simply because a party found the contract to be burdensome or a financial failure." *Umbelina v. Adams,* 2011 PA Super 257, 34 A.3d 151, 159–60 (2011). Thus, if "the breach is an immaterial failure of performance, and the contract was substantially performed, the contract remains effective.... In other words, the non-breaching party does not have a right to suspend performance if the breach is not material." *Widmer Eng.,* 837 A.2d at 468–69 (ellipses added; other modifications, internal quotation marks, and citations omitted).

■ Because of the importance of the latter principle, establishing "materiality" requires a substantial showing. To determine materiality, Pennsylvania courts refer to the Restatement (Second) of Contracts § 241 (1981), which sets forth the following factors to guide the inquiry:

a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

b) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;

c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.

*Id.* at 468; *see Gray,* 448 Pa.Super. at 468, 671 A.2d at 1172; *cf. Jennings,* 119 A.2d at 611 (applying predecessor First Restatement provision). Similarly, we have held:

Whether a breach is so substantial as to justify an injured party's regarding the whole transaction as at an end "is a question of degree; and must be answered by weighing the consequences in the actual custom of men in the performance of contracts similar to the one that is involved in the specific case."

*2401 Penna. Ave. Corp. v. Federation of Jewish Agencies of Greater Phila.,* 319 Pa.Super. 228, 466 A.2d 132, 139 (1983) (quoting 4 Corbin, Contracts § 946 (1951)). The trial court, however, did not mention or apply the § 241 factors.

■ Except in cases of "material" breach, "conditions precedent to a contract termination must be strictly fulfilled." *Accu–Weather, Inc., v. Prospect Comms., Inc.,* 435 Pa.Super. 93, 644 A.2d 1251, 1254 (1994). In an oft-cited case, our Supreme Court held:

To be effective, a notice for the rescission or termination of a contract must be clear and unambiguous, conveying an unquestionable purpose to insist on the rescission. And where the conduct of one having the right to rescind a contract is ambiguous, and it is not clear whether he has rescinded it or not, he will be deemed not to have done so.

*Wright v. Bristol Patent Leather Co.,* 257 Pa. 552, 101 A. 844, 845 (1917) (quoting 2 Black on Rescission of Contracts § 574 (1916)). In both *Accu–Weather* and in *Wright,* ambiguous indications of intent to terminate or rescind an agreement— whether written or oral—were deemed insufficient to do so.

We emphasize that we and other courts consistently have treated inquiries into the materiality of a given breach as fact questions rather than questions of law to be decided from the bench. *See Ott*, 541 A.2d at 1145 (citing 17 Am.Jur.2d § 365); *Sands v. Wagner*, No. 4:01–CV–1475, 2006 WL 1094555, at *3 (M.D.Pa. April 25, 2006) ("[T]he question whether there has been a material breach [under Pennsylvania law] is ordinarily for the jury." (citation and internal quotation marks omitted)); *cf. Cameron v. Berger*, 336 Pa. 229, 7 A.2d 293, 296 (1939) ("[W]here an insurer seeks to avoid liability for lack of co-operation, the question whether there has been a material breach of the condition is ordinarily for the jury.").

We are constrained to find that the learned trial court's entry of a directed verdict in this case constituted an abuse of discretion. On the road to that outcome, the trial court, both explicitly and in silence, decided too many questions of disputed, material fact. This, notwithstanding that a jury had heard all of the evidence necessary to make those findings for itself. More troubling still, the trial court did not endeavor to explain why these various disputed facts were not relevant to the materiality inquiry.

In its opinion, the trial court did not meaningfully address Appellants' contentions that the leases had been amended to eliminate the requirement that Appellants maintain a retail business at all times during the lease term.[11] The court's failure to address this central issue left a critical gap in its reasoning. Notably, in its brief before this Court, Singularity refers only to language in the original leases, disregarding the amendments. Brief for Appellee at 10.

Moreover, even had the trial court—or the jury, had it been given the opportunity—found that the amendments in question did not relieve Appellants' obligation to maintain a going business, the court failed to address whether this failure constituted an incurable, material breach. While it is necessary to determine whether a party asserting material breach has been denied the benefit of the bargain with its counterparty, this Court has held that "[a] tenant has no duty, implied-in-law, to occupy the leased premises. Absent a lease provision or agreement to the contrary, there are two basic incidents of a tenancy: the right to possession of the leasehold by the tenant and the corresponding right to receive rent payments by the landlord."

---

11. The trial judge's statements in open court following the close of evidence indicate an unequivocal dismissal of the lease amendments. It appears that the trial court's inclination was at war with the amendments' plain language. Arguably, the amendments' language contradicted or obviated Appellants obligation, if any, to maintain a going business that remains open on a daily basis. The following comments are illustrative: N.T. at 478, R.R. at 484a ("The guy was in default for three years.... [I]t's a strange reason to suggest that because there's that addendum that says you can do things other than a jewelry store, that you can turn out the lights and do absolutely nothing in there that is available, that is obvious to the work." Continuing: "And the idea is that this is a commercial strip, and people—if you're going to have a lease with us, you got to be there selling your product or get out. He did neither."); N.T. at 486, R.R. at 492a (refusing to "suspend disbelief," and concluding that Appellants were "in default for a long time and erroneously believe that any legal business [meant they] could do whatever [they] wanted or nothing"). In much the same way, the court summarily treated as a question of law the parties' intent regarding the facial inconsistency between the lease's requirements in this regard and the effect of subsequent amendments regarding maintenance and use of the suites. N.T. at 486, R.R. at 492a. ("Obviously [Appellants'] view is that once they said you can have any legal business, the 45 pages of the 204–205 Lease disappeared. That's what I gather. I don't think that's true or correct. But that's not something the jury rules on.").

*2401 Penna. Ave. Corp.,* 466 A.2d at 137. We continued: "The obligations of the tenant inherent in the landlord-tenant relationship which arise without the aid of any express promise by the tenant are to pay the rent reserved, not to commit waste, and not to use the leased property for an illegal purpose." *Id.* (quoting the Restatement (Second) of Property, Ch. 12, Intro. Note (1976)). If the fact-finder or the court concluded that the leases as amended relieved Appellants of their obligation to maintain a daily retail business, it is a question of fact whether Appellants satisfied the core obligations spelled out in *2401 Pennsylvania Ave.*[12]

Even if the fact-finder and/or the trial court determined that Appellants were obligated to maintain a going business, however, this could only establish simple breach, triggering the multi-factor materiality analysis specified by the Restatement (Second) of Contracts § 241. Trial testimony in this case was heard to the effect that other second-floor tenants of the Clark Building were "dark." *See, e.g.,* N.T. at 328 (Clark Building tenant Michael Kurtz testifying that he keeps one of his second-floor suites "dark" as storage), R.R. at 334a; N.T. at 243, R.R. at 249a (Clark Building tenant Abraham Frost testifying that he maintained dark spaces for up to three years, and that second-floor suites were dark at the time of his testimony). Inasmuch as the "heart" of the landlord-tenant relationship is the exchange of rent for occupancy rights, *see 2401 Penna. Ave. Corp.,* 466 A.2d at 137, whether Appellants' failure to maintain a going business constituted a "material" breach must be assessed by a jury in light of the factual context. *Cf. Widmer,* 837 A.2d at 468–69 (indicating that a breaching party's "substantial performance" of its obligations militates strongly against a finding of materiality).

Before this Court, Singularity has not asserted that either lease by its terms permitted termination without notice and without an opportunity to cure, much less that Singularity satisfied any such duty. To the contrary, the leases both are replete with various such requirements. *See, e.g.,* 201 Lease at 2, ¶ 16, R.R. at 598a ("Default"); 204–205 Lease at 8, ¶ 9.1 ("Landlord's right of cancellation"), 27, ¶ 31.1 ("Default"), R.R. at 545a, 564a (respectively). Similarly, Singularity does not argue that it had explicit relocation authority of any kind under the 201 Lease, or that the circumstances permitting relocation under the 204–205 Lease as amended had obtained. Rather, it asserts that any such obligations were not binding in light of Appellants' breach. *See* Brief for Appellee at 12 ("[Appellants'] act of abandoning and vacating the premises was a breach of the contract that was so material it went to the heart of the contract and [Singularity] did not have to give [Appellants] notice or an ability to cure the breach.").[13]

---

12. Taking at face value Appellants' contention that these amendments arose in some way from the resolution of prior disputes with Hoban, answering this question may require recourse to evidence pertaining to the intended effect of that settlement. Although we affirm the jury's negligence verdict, we reserve the question of the admissibility of such evidence because we find it immaterial to the jury's consideration of that claim. Thus, if the trial court, in its discretion, deems such evidence relevant and otherwise admissible for purposes of resolving this issue on remand, nothing in our disposition of this case should be construed as precluding the trial court from taking such evidence.

13. Because we reverse the trial court's breach of contract ruling, we need not reach the question of whether Singularity breached the leases by relocating Appellants to the fourth floor as Appellants allege. We leave it to the trial court to determine whether these questions must be resolved, and, if so, whether they must be submitted to the jury.

Simply asserting without meaningful argument or explanation that a given breach is "material" (a complex, often fact-intensive question), as the trial court and Singularity both do, cannot obviate the factual questions and interpretive issues that neither the trial court nor the jury addressed. Although we are bound to defer to the trial court's application of the standards that apply to the grant of a directed verdict, we nonetheless review the trial court's legal rulings *de novo*. *Janis v. AMP, Inc.*, 856 A.2d at 143–44. Measuring the few cursory reasons cited by the trial court for its grant of a directed defense verdict, we find that the court abused its discretion in granting a directed verdict to Singularity. The question is not whether one part or the other had the best of the evidence of record, but whether a jury reasonably could have granted relief to Appellants. We are bound to review the evidence in a light most favorable to Appellants. Based upon the record, we believe that a reasonable jury **could** have ruled for Appellants. Accordingly, we reverse the trial court's grant of a directed verdict for Singularity on Appellants' breach of contract claim.

### Non–Suit: Tortious Interference with Contractual Relations

■ Finally, we address Appellants' challenge to the trial court's order to the extent that it granted Singularity's motion for non-suit against Appellants. Our standard of review of a compulsory non-suit is well-established:

A motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiffs' evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action; in making this determination, the plaintiff must be given the benefit of all reasonable inferences arising from the evidence. When so viewed, a non-suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action; it is the duty of the trial court to make this determination prior to the submission of the case to the jury. When this Court reviews the grant of a non-suit, we must resolve all conflicts in the evidence in favor of the party against whom the non-suit was entered.

A compulsory non-suit is proper only where the facts and circumstances compel the conclusion that the defendants are not liable upon the cause of action pleaded by the plaintiff.

*Poleri v. Salkind,* 453 Pa.Super. 159, 683 A.2d 649, 653 (1996) (citations and internal quotation marks omitted).

■ Appellants do not argue—or at least do not argue clearly and effectively— that they had entered into a binding agreement for the transfer of the business to Uri Hakami with an assignment of the leaseholds. Rather, Appellants' claim self-evidently sounds in tortious interference with **prospective** contractual relations.

Our Supreme Court has adopted Restatement (Second) of Torts § 766B to adjudicate such claims. *See Glenn v. Point Park College,* 441 Pa. 474, 272 A.2d 895, 897 (1971). Section 766B provides:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (1979); *see Behrend v. Bell Tel. Co.,* 242 Pa.Super. 47, 363 A.2d 1152, 1158–59

(1976), *vacated on other grounds*, 473 Pa. 320, 374 A.2d 536 (1977). The commentary to § 766B indicates that such a claim may find its basis in "any prospective contractual relation," including "the opportunity of selling or buying land ... and any other relations leading to potentially profitable contracts." Restatement (Second) of Torts § 766B, cmt. c. With regard to intentionality, § 766B cross-references § 8A, which provides: "Intent is not ... limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Id.* § 8A, cmt. b.

■ In order to state a claim of tortious interference with prospective contractual relationship upon which relief may be granted, a plaintiff has the burden of pleading and proving:

1) a prospective contractual relation;

2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;

3) the absence of privilege or justification on the part of the defendant; and

4) the occasioning of actual damage resulting from the defendant's conduct.

*Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 (1979) (citing *Glenn*, 272 A.2d at 898–99). The plaintiff also must plead and prove "a reasonable likelihood or probability that the anticipated business relationship will be consummated." *Behrend*, 363 A.2d at 1159.[14]

■ Appellants explicitly pleaded these elements in their Complaint. *See* Complaint ¶¶ 59–63. Moreover, the trial evidence, evaluated in a light most favorable to Appellants, established a jury question as to each element. With regard to the first element, Mr. Hakami testified at length—and without direct contradiction by any other witness—that he and Appellant Goldstein had negotiated the principal terms of the transaction to the point of a commitment in principle. Mr. Hakami further testified that the deal thus formed was binding under the practices and conventions of the diamond trade. He testified that Appellant Goldstein's statement "mazal" indicated a binding, enforceable agreement among diamond traders. N.T. at 63, R.R. at 69a ("It's called mazal.... It's a word used all over the world, but in the diamond industry, whether you're in India, Hong Kong, Israel or Belgium, and it's binding. Once you said the word, it's like signing a contract."); *id.* ("If somebody would break [mazal], I could take him to arbitration within the diamond industry."). Mr. Hakami then testified that the parties' handshake on the deal later that year had similar effect, reinforcing their mutual commitment to the negotiated terms of the sale and lease assignment.

14. In the closely related context, in *Behrend* we elaborated on the nature of prospective relationships:

The tort of intentional interference with business requires, as a basis, that a business relationship be proved with some degree of specificity, at least to the point that future profit be a realistic expectation and not merely wishful thinking. It is true that where a prospective advantage is alleged, the plaintiff need not demonstrate a guaranteed relationship because anything that is prospective in nature is necessarily uncertain. We are not here dealing with certainties, but with reasonable likelihood or probability. This must be something more than a mere hope or the innate optimism of the salesman. As defined by the courts in this Commonwealth, the tort contemplates a relationship, prospective or existing, of some substance, some particularity, before an inference can arise as to its value to the plaintiff and the defendant's responsibility for its loss.

363 A.2d at 1160 (internal quotation marks and citations omitted).

*See, e.g.,* N.T. at 60–64, R.R. at 66a–70a; N.T. at 109, R.R. at 115a (testifying that, following their handshake, "[Appellant Goldstein] could not withdraw—he could not walk out of this deal if I insist on it").[15]

 With regard to the second element, intent to harm, there was sufficient evidence to establish a jury question regarding whether Singularity had the "intent," as defined by the Restatement, to interfere with the prospective contract in question—*i.e.,* based upon, at a minimum, knowledge that "the consequences [were] certain, or substantially certain, to result" from its actions. Specifically, Mr. Goldstein testified that he contacted an attorney for Singularity on or about October 31, 2006—following Singularity's notice of intent to relocate, but well in advance of the relocation itself—to demand that Singularity cease and desist. Mr. Goldstein testified, reading directly from the communication in question, that he informed Singularity that he was "currently negotiating both the sublease and/or assignment of this space, as is my right under the above-listed documents." N.T. at 228, R.R. at 234a. Thus, a jury reasonably could have concluded that Singularity knew of Appellant Goldstein's prospective assignment, and therefore knew that its actions were at least likely to undermine any such deal.

 As for the third element, concerning privilege, Appellants' evidence and argument that Singularity had no authority under the leases to relocate Appellants' second floor spaces to the fourth floor warranted careful consideration by the court and/or the jury. As we have noted above, the 201 Lease as amended contains no provision covering compulsory relocation for any reason. The 204–205 Lease as amended appears to permit compulsory relocation only in the event that a single tenant leased at least 70% of the second floor, which appears not to have occurred at any time relevant to this dispute. Thus, without the trial court's ruling as a matter of law that Appellants materially breached both leases, we struggle to discern how Singularity's actions in themselves would not amount to breach, regardless of any reciprocal breach by Appellants, material or non-material. Notwithstanding our skepticism, we make this observation only to underscore the importance to the just disposition of this case of a rigorous inquiry into the materiality of Appellants' breach, if any—aided as necessary by the fact-finder. We find that open questions of law and fact remain regarding whether Singularity has a contractual or privilege-related defense to Appellants' claim of breach for unauthorized relocation.

 The fourth element, concerning damages and causation, requires little discussion. The testimony established a sufficient basis for a jury to conclude first that the parties had agreed in principle to an assignment of the leases for $250,000. Mr. Hakami testified that, if necessary, he would have had "no problem" procuring the documentation specified in the amendment to establish his creditworthiness, and that doing so would have taken no more "than a couple days." N.T. at 113–14, R.R. at 119a–20a. Mr. Hakami further testified that the parties were in the process of finalizing the deal when the relocation occurred. N.T. at 109, R.R. at 115a (testifying that, following the parties' handshake, he was waiting on final paperwork to review with his attorney). And as set forth above, Mr. Hakami testified that

---

**15.** This testimony was summarily rejected by the court in a credibility determination more properly the province of the jury as fact-finder. *See, e.g.,* N.T. at 484, R.R. at 490a ("And if the mazal was so legally binding, why didn't [Mr. Hakami] go after [Appellant] Goldstein for it?").

the relocation eliminated his basis for seeking the assignment, hence scuttling the deal. Both Mr. Hakami and Ms. Bucci–Reuter, the latter called by Singularity, testified that fourth floor leaseholds were substantially less valuable to a retail jewelry business. *See* N.T. at 68–70, R.R. at 74a–76a (Hakami); N.T. at 440, R.R. at 446a (Bucci–Reuter). Thus, a jury reasonably could have found that Appellants suffered considerable financial harm as a consequence of Singularity's actions.

In support of its entry of non-suit, the trial court reasoned in two dimensions. First, it found that, "[c]ontrary to [Appellant Goldstein's] belief that he and the Plaintiff had an agreement, Mr. Hakami testified that he was not familiar with the terms of the leases relative to assignment and that he had not been provided any documents by Appellants in relation to the assignment." T.C.O. at 6. The court then ruled that Mr. Hakami had failed to document his creditworthiness, which the court found to be required by the terms of the leases before Appellants could assign them. T.C.O. at 6–7. In effect, the trial court ruled that Appellants' tortious interference claims failed because Mr. Hakami and Appellants failed to enter a binding contract. The trial court thus failed to address whether Appellants made out a *prima facie* claim for tortious interference with **prospective** contractual relations.

Taking these bases for non-suit in turn, Appellant Goldstein's "belief" that the parties had reached an agreement was supported by Mr. Hakami's testimony that he, too, believed a deal had been achieved in all relevant particulars. Moreover, Mr. Hakami's testimony does not support the trial court's finding that Mr. Hakami "had not been provided any documents by Appellant in relation to the assignment." Although Mr. Hakami testified that he did not specifically recall the assignment terms of the leases, he remembered receiv-

ing certain documents associated with the leases, as well as the leases themselves. Moreover, he testified that he had reviewed those documents over years of discussions regarding the purchase, and that he must have satisfied himself that the terms were acceptable. In particular, he testified repeatedly that his interest in the assignment was substantially based upon the renewal and option terms in the leases, which he had gleaned not from unsubstantiated assertions by Appellant Goldstein, but from the leases. *See* N.T. at 96–98, R.R. at 102a–104a; N.T. at 103, R.R. at 111a; N.T. at 105, R.R. at 111a; N.T. at 112, R.R. at 118a. Had Mr. Hakami received the leases in full at the time in question, those leases would have included the amendatory provisions regarding assignment. The trial court, thus, based this aspect of his ruling on a finding of fact that more properly lay within the province of the jury as fact-finder.

Regarding the trial court's second cited basis for non-suit, we find two problems. First, we question the summary interpretation of the provision in question. The assignment-related amendment, which was made to both leases, provided as follows:

Notwithstanding anything to the contrary set forth in the Lease, Lessee shall be permitted to assign or sublet the Premises without the approval of the Lessor being required; provided, to the extent of an assignment of Lease, if Lessee provides or causes to be provided, to Lessor the following information about such assignee: (i) references from three (3) trade creditors who each states that such assignee is in good standing with such trade creditor; (ii) a reference from a bank with which such assignee has a banking relationship confirming the assignee's good standing with the bank; and (iii) a copy of current finan-

cials of the assignee showing that the assignee's assets are greater than its liabilities, then, in such event, Lessee shall be released of all liability and obligations thereafter arising under the Lease upon assumption of the Lease by such assignee.

204–205 Lease, Amendment to Lease, 1/27/1992, at 2, ¶ 6, R.R. at 594a; *see also* 201 Lease, Amendment to Lease, 1/27/1992, at 2, ¶ 6, R.R. at 603a (amending the 201 Lease identically).

This inelegantly worded provision—bargained for by Appellants and Hoban years after executing the original leases, and modifying or obviating the leases' prior, far less permissive assignment provision [16] —is facially ambiguous. "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385, 390 (1986). On the reading favored by the trial court, the amendment specified that assignment without Singularity's permission required the prescribed demonstration of creditworthiness. On another entirely tenable reading, however, the creditworthiness demonstration is required above and beyond assignment, permissible without approval, only to relieve the assignor, *i.e.* Appellants, of liability under the lease following assignment. Much hinges on the use of the semicolon at the end of the first clause, and the immediately following clause beginning "provided."

We find that the trial court abused its discretion in failing at least to unpack this language carefully, and to state clearly in its opinion the role its legal conclusions played in its entry of non-suit on Appellants' tortious interference claims. Inasmuch as we find the provision to be ambiguous, the trial court erred in ruling otherwise.

"The court, as a matter of law, determines the existence of an ambiguity and interprets the contract whereas the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact." *Id.* We express no opinion regarding the necessity of fact-finding to conclusively determine the effect of the amendment. Rather, we leave it to the trial court to determine the extent to which this ambiguity bears on Appellants' tortious interference claim. As noted, the court's determination from the bench that the creditworthiness requirement was a condition precedent to any assignment under the amendment appears to have been dispositive of its grant of non-suit on Appellants' tortious interference claims. If the trial court would so rule again, it must first resolve the ambiguity in due course by gleaning the parties' intent—by recourse to fact-finding and parol evidence, if necessary. *See Hutchison, supra; Tuthill v. Tuthill,* 763 A.2d 417, 419 (Pa.Super.2000) (holding that the parties' intent governs contract interpretation).

The above ruling does not exhaust our concerns with the trial court's analysis of Appellants' tortious interference claim. Even if we were to accept, *arguendo,* that the showing of creditworthiness specified in the contract was necessary and not contingent, the evidence created a jury question regarding whether Singularity interfered with prospective contractual relations. Mr. Hakami testified that it would require only days for him to arrange to make the specified showing in each particular, N.T. at 113–14, R.R. at 119a–20a; the relocation, however, interrupted the assignment process before the parties reached that point. The trial court effectively discarded the prospect of relief for prospective contractual relations

**16.** *See* 201 Lease at 3, ¶ 24, R.R. at 99a; 204– 205 Lease at 18, ¶ 22.1, R.R. at 555a.

when it based its ruling solely on Mr. Hakami's failure to provide Singularity with the creditworthiness documents—in effect demanding that Appellants and Mr. Hakami fully consummate a written contract for assignment before relief might be granted for tortious interference.

To uphold the trial court's approach under these circumstances would be to all but nullify the tortious interference with prospective contractual relations claim. Given the opportunity, Appellants' evidence might have satisfied a jury as to the presence of all four elements of the prescribed inquiry. *See Thompson Coal,* 412 A.2d at 471, and discussion concerning same, *supra.* If the handshake and oral agreement ("mazal")—attested to be signs of binding agreement binding among diamond-traders—as to the material terms of a significant transaction discussed by Appellant Goldstein and Mr. Hakami over a matter of years did not present a jury question regarding the presence of a "prospective contractual relation," we are hard-pressed to imagine what "prospective" contractual relation would occupy the narrow band between the agreement in principle at issue in this case and a fully executed, written agreement. We decline to read Appellants' cause of action so narrowly.

For the above-stated reasons, we find that the evidence established a mixed question of law and fact regarding the meaning of the amendment's revised assignment provision, which the trial court should have addressed fully, with such fact-finding as its resolution required performed by the jury. Moreover, the remaining elements of the tortious interference inquiry presented questions of fact warranting submission to the jury.

Thus, we conclude that the trial court abused its discretion in granting a non-suit as to Appellants' claim for tortious interference with contractual relations at the close of Appellants' case-in-chief. Accordingly, we reverse.

### Conclusion

We affirm the trial court's order denying JNOV on Appellants' negligence claim. A jury verdict is not to be disturbed lightly, and Appellants fail to show that the trial court abused its discretion in declining to do so.

We reverse the trial court's orders granting a directed verdict to Singularity on Appellants' breach of contract and a non-suit on Appellants' tortious interference with contractual relations claims. The trial court abused its discretion in failing to submit to the jury questions of fact regarding Singularity's defense theory of "material breach," and in omitting to evaluate the materiality of Appellants' alleged breach according to the factors prescribed by Restatement (Second) of Contracts § 241.

The trial court also erred in entering a non-suit on Appellants' tortious interference with prospective contractual relations claim. The trial court abused its discretion in denying a jury the opportunity to pass on disputed issues of material fact bearing on the intent of Appellant Goldstein and Mr. Hakami, and separately the intent of Appellants and Hoban in modifying the leases regarding conditions for the assignment of same.

Our primary basis for reversal is the trial court's failure to submit numerous issues to the jury. It is not our place to establish narrow bounds for the conduct of any further discovery, evidentiary rulings, or re-trial as to any of these issues. We merely direct the trial court to address the above-stated issues if and as they arise consistently with the above analyses.

Judgment vacated. Order denying Appellants' motion for judgment notwithstanding the verdict on Appellants' negli-

gence claim affirmed. Order(s) granting non-suit and directed verdict reversed. Case remanded. Jurisdiction relinquished.