J-A24004-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| SCOTT I. DEAKTOR AND MARSHA A. DEAKTOR, HUSBAND AND WIFE D/B/A SCOTT AND MARSHA DEAKTOR REAL ESTATE | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : : | |
| v. | : | No. 1548 WDA 2019 |
| | : : | |
| RAYMOND K. SUTTON A/K/A KEVIN SUTTON AND BETH F. YOUNG SUTTON, HUSBAND AND WIFE | : : : | |

Appeal from the Judgment Entered July 30, 2019
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  No. GD 16-12764

| | | |
|---|---|---|
| SCOTT I. DEAKTOR AND MARSHA A. DEAKTOR, HUSBAND AND WIFE D/B/A  SCOTT AND MARSHA DEAKTOR REAL ESTATE | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : : : | |
| v. | : : : | |
| | : : | No. 1565 WDA 2019 |
| RAYMOND K. SUTTON A/K/A KEVIN SUTTON AND BETH F. YOUNG SUTTON, HUSBAND AND WIFE, | : : : : | |
| Appellants | : | |

Appeal from the Judgment Entered July 30, 2019
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  No. GD-16-12764

BEFORE:   BENDER, P.J.E., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:              FILED DECEMBER 15, 2020

Appellants, Scott I. Deaktor and Marsha A. Deaktor, husband and wife

d/b/a Scott and Marsha Deaktor Real Estate, appeal and Appellees, Raymond

K. Sutton a/k/a Kevin Sutton and Beth F. Young Sutton, husband and wife,

cross-appeal from the July 30, 2019 judgment entered by the trial court

following a non-jury trial. After careful review, we affirm.

The trial court summarized the factual and procedural background of

this case as follows:

> In 2016, the Sutton family had to relocate from Washington, D.C.
> to Pittsburgh because [Mr.] Sutton left his position as assistant
> coach of the Georgetown University men['s] basketball team for a
> position as assistant coach of the University of Pittsburgh men['s]
> basketball team. Mr. Sutton's wife, Beth, suffers from moderate
> asthma, while their youngest daughter, then six years old, suffers
> from severe asthma. Hence, during negotiations to rent a
> townhouse located in Pittsburgh at 709 Copeland Street, the
> Suttons informed [Ms.] Deaktor, who owned the property with her
> husband, Scott, that [Ms. Sutton] and their two daughters
> suffered from asthma triggered by poor air quality. While Ms.
> Deaktor described 709 Copeland Street, which rented for $5,200
> per month, as the "crown jewel" of their two hundred rental units,
> its windows had been leaking water during rainfalls for a lengthy
> period of time. The wood around the windows was rotting from
> the moisture, but the Deaktors simply painted the rotting wood
> without repairing the leaky windows. They knew, or should have
> known, that these conditions produce mold and poor air quality.
> Ms. Deaktor, however, told the Suttons the air quality was good
> and did not disclose the condition to the Suttons before they
> signed a lease agreement on April 25, 2016.
>
> Mr. Sutton was able to move to 709 Copeland Street on April 29,
> 2016. Due to her employment as a teacher, Ms. Sutton could not
> physically inspect the property before the lease signing and
> remained in Washington, D.C.[,] with their youngest child until
> June 10. Shortly after they moved in, Ms. Sutton and her
> daughter began experiencing asthma symptoms. When her
> daughter's symptoms worsened, Ms. Sutton started the "action
> plan" from her daughter's physicians that included using a

nebulizer every four hours followed by Flonase. The Suttons also noticed water penetrating the home during a rainstorm and suspected poor air quality due to it. On June 21[,] the Suttons notified Ms. Deaktor that, due primarily to the[ir] illness from mold in 709 Copeland Street, they could no longer stay there and wanted to be released from the lease. After Ms. Deaktor refused to have a mold test done, on June 24[,] Mr. and [Ms]. Sutton had 709 Copeland Street tested for mold, and on June 28[,] they received the results. Stachybotrus, more commonly known as toxic black mold, was present in the air samples from June 24. Ms. Sutton was terrified, and after her daughter slept there that night wearing a mask that filters out pollutants in the air, on June 29[,] the Suttons moved out. They stayed in Pittsburgh hotels and traveled elsewhere until July 15, when they moved to another home in the Pittsburgh area. Two days before that, Mr. and [Ms]. Deaktor filed the complaint in civil action that began this proceeding.[1]

On March 27, March 28[,] and April 18, 2019, the dispute went for resolution by way of a non-jury trial before me. I then issued a verdict in favor of Mr. and [Ms]. Deaktor in the amount of $61,860, with a counterclaim verdict in favor of Mr. and [Ms]. Sutton in the amount of $40,303.06.[2] Mr. and [Ms]. Deaktor, as well as Mr. and [Ms]. Sutton, filed [timely] motions for post-trial relief. I denied those motions and entered judgment on the verdict. Mr. and [Ms]. Deaktor filed a timely appeal to the

---

[1] The Deaktors later amended their complaint, bringing causes of action for breach of contract and breach of the implied duty of good faith and fair dealing. The Suttons subsequently filed an Amended Answer, New Matter, and Counterclaim, advancing claims for breach of contract (failure to repair), breach of the implied warranty of habitability, violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 P.S. §§ 201-1 et seq., and violation of the Landlord and Tenant Act, 68 P.S. §§ 250.101 et seq.

[2] The Deaktors' $61,860 verdict consisted of $5,200 for July rent, $15,900 (includes security deposit) for the Suttons' early termination of the lease, $760 for electric, and $40,000 in attorneys' fees. The Suttons' $40,303.06 verdict is comprised of $20,303.06 for UTPCPL losses (specifically, $10,151.53 in losses that the trial court doubled), and $20,000 in attorneys' fees. See Non-Jury Verdict, 4/24/19, at 2 (unnumbered pages).

Commonwealth Court of Pennsylvania, with Mr. and [Ms]. Sutton thereafter also filing a timely appeal to the Commonwealth Court of Pennsylvania.[3]  However, the dispute is not within the jurisdiction of the Commonwealth Court, and on September 30 and October 1, 2019[,] the Commonwealth Court ordered the transfer of it to the Superior Court of Pennsylvania.

Trial Court Opinion (TCO), 10/28/19, at 1-3.

### The Deaktors' Appeal

We address the Deaktors' appeal first.  They raise the following issues for our review:

1. Whether the [t]rial [c]ourt abused its discretion and erred as a matter of law in giving [the Suttons] the benefits of the early termination clause of the [l]ease where [the Suttons] did not exercise their rights thereunder?

2. Whether the [t]rial [c]ourt abused its discretion and/or erred as a matter of law in finding a violation of the [UTPCPL] where: [the Suttons'] damages were not a result of such a violation; the finding was based upon purported pre-lease, parol evidence; the [t]rial [c]ourt found the [l]ease [p]remises suitable for persons of ordinary sensibilities[;] and [the Deaktors] did not violate the Landlord Tenant Act?

3. Whether the [t]rial [c]ourt's conclusion that there was harmful mold in the [l]ease [p]remises which affected a child of hypersensitivities, but not persons of normal sensitivities, in the absence of any expert or other competent evidence or testimony was supported by substantiated evidence?

Deaktors' Brief at 4.

At the outset, we observe:

Our appellate role in cases arising from nonjury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law.  The

_____

[3] After filing their notices of appeal, both parties timely complied with the trial court's instruction to file concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of the jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue … concerns a question of law, our scope of review is plenary.

The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

The trial court, as the finder of fact, is free to believe all, part or none of the evidence presented. Issues of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determination or substitute our judgment for that of the fact finder.

Gamesa Energy USA, LLC v. Ten Penn Center Associates, L.P., 181 A.3d 1188, 1191-92 (Pa. Super. 2018) (internal citations and quotation marks omitted; brackets in original).

## First Issue

In the Deaktors' first issue, they argue that the trial court abused its discretion and erred as a matter of law in giving the Suttons the benefits of the early termination clause contained in the lease, when the Suttons failed to exercise their rights under that clause. See Deaktors' Brief at 38. The at-issue early termination clause provides the following, which we produce verbatim:

18. <u>DEFAULT</u>

\* \* \*

E) If TENANT wishes to DEFAULT through an EARLY TERMINATION of this Lease before the end of the specified Lease Term, Tenant must:

1. Give LANDLORD 30 (thirty) day written NOTICE before TENANT's actual move-out day. (Tenant is responsible for the leased property during this full 30 day term which also includes maintaining service with all applicable utilities providers and also being current of all remittances for the monthly rent during this full 30 day period as specified in Paragraph 2 of this Lease);

2. Written NOTICE will go into effect on the 1st of the preceding month after NOTICE is received. (Example: If NOTICE is received on June 15, 2018, NOTICE will go into effect July 1, 2018);

3. Forfeit to LANDLORD your full security deposit;

4. Pay LANDLORD non-refundable settlement fee equivalent to two (2) month's rent (this will not be returned to TENANT), payable by money order, certified check, or cashier's check, DUE on the 1st day of the month that NOTICE takes effect. (Example: if NOTICE is received on June 15, 2018, NOTICE will go into effect July 1, 2018, and PENALTY FEE is also due on July 1, 2018);

5. Be up to date on rent, utilities, and any other applicable remittance as specified within this Lease;

6. Comply with an immediate property inspection subject to the convenience of LANDLORD as soon as NOTICE takes effect;

7. Pay LANDLORD if TENANT damaged the Leased Unit for any loss if TENANT broke promise in this Lease. TENANT must follow all vacating procedures and is subject to the charges outlined within the "Vacating Procedures" of this Lease;

8. Vacate the Leased property on or before the last day of the month that NOTICE is in effect by 5PM Eastern Standard Time. (Example: If NOTICE takes effect on July 1, 2018, tenant must vacate property on or before July 31, 2018 by 5PM EST).

9. In addition to the above 18E-1 through 18E-8; TENANT agrees to reimburse LANDLORD in a separate

check payable to SMDRE[4] equal to the amount of $100.00 (one hundred U.S. Dollars) for City Ordinance Registration Fee if Ordinance is approved and passed by City of Pittsburgh at time of DEFAULT.

Deaktors' Exhibit 6 at 4 (cited to hereinafter as the Lease).

Here, in limiting the Deaktors to damages of $15,900 under the early termination clause, the trial court explained:

The Deaktors contend that I made an error by limiting their damages claim to those available under the "early termination clause" of the lease. At the trial, the Deaktors requested damages for the rent and late charges due throughout the entire one year term of the lease.[5] I rejected this request and, in fact, did limit the Deaktors to damages of $15,900 under the early termination clause. The Deaktors argue that the Suttons should not get the benefit of the early termination clause because they did not timely exercise it. I disagree.

The June 21, 2016 email from the Suttons to Ms. Deaktor (admitted at trial as [Deaktors' E]xhibit 21) states: "…[W]e are respectfully requesting to be released from our lease…. [T]here is mold in this house. That is a big health issue and we cannot stay here. So[,] as a result[,] it is critical that we move to another location as soon as possible. We request to be released from our lease by July 31, 2016." This fulfilled the requirement in the clause of thirty days written notice before the actual move-out date. Ms. Sutton credibly testified to Ms. Deaktor's telephone call on June 22, 2016[,] in response to the notice:

She called and was very animated and angry and for some reason I think called back or Kevin put her on speaker so we could both hear. She was mad and she was saying this

_____

[4] "SMDRE" stands for "Scott and Marsha Deaktor Real Estate." See Deaktors' Brief at 11 n.3.

[5] The lease imposed a $25 per day late charge for any monthly rent payment not paid in full on or before the applicable monthly due date. Lease at 2. In the Deaktors' post-trial motion, they asserted that the rent due from July 2016 through April 2017 amounts to $52,000, and the total late charges for each late monthly rent payment comes to $35,200. See Deaktors' Post-Trial Motion, 5/3/19, at 16-17.

is a top quality place. This is an amazing quality and this and that. She was yelling, and she was very hot and heated[,] basically said to us you're not getting out of this. It's an ironclad lease and you'll have to pay at least $25,000 if you want to get out.

[N.T. Trial, 3/27/19-3/28/19, at 396]. Then, on June 23, 2016, Ms. Deaktor sent an email to the Suttons containing these cryptic statements: "It is unfortunate to hear that you are considering the option of Lease Default. For your reference[,] a copy of your Lease Agreement is attached to this email. The [t]erms and remedies for Default are outlined within this document.... If you both opt to proceed with vacating early, your decision will constitute default...." Deaktors['] [E]xhibit 22. Had the Suttons then examined the lease, it would have been difficult for them to locate the early termination provision as Ms. Deaktor referenced only "Default" and the Suttons' intention was not to default. Another difficulty the Suttons would have had is subparagraph 2 of the nine subparagraphs of the early termination provision contains this erroneous and ambiguous statement: "Written NOTICE will go into effect on the 1st of the preceding month after NOTICE is received...."

The Suttons actually were prepared to pay the Deaktors $25,000 to be released from the lease. [See N.T. Trial, 3/27/19-3/28/19, at 440-41]. However, Ms. Deaktor failed to act in good faith and explain they would be released if they paid their July rent on time, forfeited their security deposit, paid $10,400 by July 1[,] and fulfilled the other conditions in the early termination provision. The Suttons instead ended up hiring an attorney to decipher the lease for them. The attorney sent the Deaktors a letter on July 11, 2016[,] reiterating that the property would be vacant by July 31. See Suttons['] Exhibit 7.[6] Then, on August 5, the Suttons' attorney made the Deaktors' attorney an offer to immediately make all payments and fulfill all other conditions of the early termination provision. See Suttons['] Exhibit 59. Under these circumstances, the Suttons['] not exercising the early termination provision at an earlier point in time was primarily due to Ms. Deaktor's failure to act in good faith. The Deaktors also identify no loss to them from the formal offer to fulfill the early termination clause being thirty-five days late. Thus, the untimely exercise of

_____

[6] Ms. Sutton also testified that the Suttons' attorney placed their July rent payment in an escrow account. N.T. Trial, 3/27/19-3/28/19, at 395.

the early termination provision was not a material breach that excused its performance by the Deaktors. See *International Diamond Importers, Ltd.* [v]. *Singularity Clark, L.P.*, … 40 A.3d 1261 [(Pa. Super. 2012)]. Hence, I was justified in limiting the Deaktors' damages pursuant to the early termination provision.

TCO at 3-6 (footnote and some internal citations omitted).

The Deaktors contend that the trial court "abused its discretion and committed [an] error of law by effectively re-writing the [l]ease to insulate [the Suttons] by giving [them] the full benefit of having exercised the early termination clause … without having done so; and, thereby limiting [the Deaktors'] damages to [the Suttons'] unpaid rent for the month of July in the amount of $5,200 plus $15,900, which is equal to two months' rent plus the amount of the [s]ecurity [d]eposit." Deaktors' Brief at 40. The Deaktors claim that the Suttons failed to perform all of the conditions of the early termination provision, including providing the Deaktors with 30-day written notice of their actual move-out date, forfeiting their security deposit, paying a settlement fee of two months' rent, and being up to date on rent and utilities, among other things. See id. at 39. As a result, the Deaktors insist that the trial court "insulated [the Suttons] from [the Deaktors'] remedies and damages under Paragraph 19 of the [l]ease for not timely exercising their right of early termination and resorting to self-help as follows: 1. accelerated rents; 2. late fees; and, 3. damages to the [l]eased [p]remises." Id. at 40-41 (citations omitted).

No relief is due on this basis. Initially, we agree with the trial court that Ms. Deaktor's failure to act in good faith hindered the Suttons from complying

with the early termination clause at an earlier point in time. The record supports that Ms. Deaktor made things difficult for the Suttons following Ms. Sutton's June 21, 2016 email to her. In particular, Ms. Deaktor failed to explain, let alone specifically mention, the early termination clause to the Suttons, and told them it was an 'ironclad' lease and they were not getting out of it. We see no reason for this conduct other than an interest in being uncooperative.

Furthermore, the Deaktors claim that, under the lease, the untimely exercise of the early termination clause constitutes an event of default and, therefore, a violation, which permits them to use the remedies listed under Paragraph 19 of the lease, including collecting all unpaid rent and late charges. See Deaktors' Brief at 44-45.[7] We disagree.

This Court has previously explained:

_____

[7] The Deaktors say that they may use Paragraph 19's remedies for defaults and violations of the lease:

> The express language of Paragraph 18 of the [l]ease provides as follows: "Each one of the following is an event of DEFAULT under this LEASE; an event of DEFAULT is also called a violation:…[.]" Similarly, the [l]ease provides under subsequent Paragraph 19 "REMEDIES" as follows: On a violation of any provision of this LEASE by TENANT, LANDLORD, without prior notice to quit, can…."

Deaktors' Brief at 44 (internal citations omitted; capitalization and emphasis in original); see also id. at 40 ("Paragraph 19 of the [l]ease affords [the Deaktors] remedies against tenants who fail to or elect not to exercise the early termination provision and who are otherwise in default or violation of the [l]ease, including, inter alia, 'abandonment of the LEASED PROPERTY without LANDLORD'S written consent before the LEASE ends….'") (citation omitted).

A lease is in the nature of a contract and is controlled by principles of contract law. In construing a contract, the intention of the parties is paramount and the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished. Where the words of the contract are clear and unambiguous, the intent of the parties must be determined from the agreement itself. One part of a contract cannot be so interpreted as to annul another part, but, rather, writings which comprise an agreement must be interpreted as a whole. Ambiguous language in a contract is to be interpreted most strongly against the party who selected the language. Finally, where an act or event mentioned in a contract is not expressly made a condition precedent, it will not be so construed unless such clearly appears to be the intention of the parties.

Village Beer and Beverage, Inc. v. Vernon D. Cox and Co., Inc., 475 A.2d 117, 121 (Pa. Super. 1984) (internal citations omitted).

Here, the lease sets forth, in relevant part, the following, which we again produce verbatim:

18. DEFAULT

Each one of the following is an event of DEFAULT under this LEASE; an event of DEFAULT is also called a violation;

A.) TENANT'S failure to pay RENT & ADDITIONAL RENT when due and which is not paid within 10 (ten) days after LANDLORD gives TENANT written notice that this LEASE will terminate in 10 (ten) days after the date of notice; or

B.) TENANT'S failure to do anything else that TENANT is required to do in this LEASE and which is not remedied in 10 (ten) days after LANDLORD gives TENANT written notice that this LEASE will terminate in 10 (ten) days after the date of notice; or

C.) The giving of false information or false signatures by TENANT to LANDLORD at any time; or

D.) TENANT's abandonment of the LEASED PROPERTY without LANDLORD's written consent before the LEASE ends.

Sign: /s/ Raymond K. Sutton ___ KEVIN ___ Date: 4-25-16

Sign: /s/ Beth Y. Sutton ___ Date: 4/24/16

E.) If TENANT wishes to DEFAULT through an EARLY TERMINATION of this Lease before the end of the specified Lease Term, Tenant must:

[See items 1-9, set forth supra on pages 5-7].

Sign: /s/ Raymond K. Sutton ___ (KEVIN) ___ Date: 4-25-16

Sign: /s/ Beth Y. Sutton ___ Date: 4/24/16

19. REMEDIES

On a violation of any provision of this LEASE by TENANT, LANDLORD, without prior notice to quit, can;

A.) Declare this LEASE terminated;

B.) Sue to evict TENANT, obtain possession of the LEASED PROPERTY and recover the court costs and attorney fees incurred;

C.) Declare the unpaid balance of the TOTAL RENT immediately due and payable and collect the unpaid TOTAL RENT, ADDITIONAL RENT, and LATE CHARGES;

D.) Collect any damages caused by TENANT's failure to do any of TENANT's other obligations under this LEASE;

E.) Sue TENANT to collect the unpaid TOTAL RENT, ADDITIONAL RENT, LATE CHARGES, damages, court costs and attorney fees;

F.) LANDLORD shall be entitled to the payment of reasonable attorney's fees and costs in the event that LANDLORD prevails in Court on any action arising out of the LEASE;

G.) Any legal action arising out of the LEASE shall be brought in the Court of Common Pleas of Allegheny County and shall be governed by Pennsylvania law and local Court rules applicable to LANDLORD-TENANT actions;

H.) In an attempt to collect unpaid debts, LANDLORD will report TENANT to Credit Reporting Collection Agency. Agency will attempt to collect debt by any means necessary.

> TENANT will be responsible to Landlord for all incurred expenses associated with debt collection.
>
> Sign: /s/ Raymond K. Sutton        (KEVIN)     Date: 4-25-16
>
> Sign: /s/ Beth Y. Sutton                            Date: 4/24/16

Lease at 4.

Although the early termination provision appears in the lease under the heading of "Default" and includes the term 'default,' the lease does not explicitly identify invoking the early termination clause — or failing to comply strictly with its requirements — as 'an event of default' and 'violation.' In fact, the early termination clause is separated by signature lines from the list of 'events of default' and 'violations' set forth earlier in Paragraph 18, which signifies to us that it is meant to be different. Further, as the trial court suggested, to treat the early termination clause as a default or violation under the lease would be nonsensical, given that the early termination provision is intended to provide tenants with flexibility and prevent an event of default or violation under the lease. TCO at 5, 7.[8] Accordingly, the Deaktors do not persuade us that the Suttons' imperfect exercise of the early termination

_____

[8] Indeed, at trial, Ms. Deaktor testified, "I don't believe because someone has a contract that they need to be bound by the rigid terms of a contract, per se, but there needs to be leniency on both sides. And although it's traditional in my business for people in like businesses to take the full 12 months or whatever the period that had not been paid, we give options. We give them early termination." N.T. Trial, 3/27/19-3/28/19, at 44-45.

clause is an event of default and violation, entitling the Deaktors to use the remedies listed under Paragraph 19 of the lease.[9]

Finally, the Deaktors complain that, "despite citing to [International Diamond] in support of its [o]pinion, the [t]rial [c]ourt did not perform the

_____

[9] We deem waived the Deaktors' claim that the trial court overlooked other violations of the lease, such as the Suttons' abandoning the premises without consent and withholding rent, which the Deaktors say would have also entitled them to use the remedies in Paragraph 19. See Deaktors' Brief at 45 (claiming that the trial court "overlooked other instances of [the Suttons'] default under the [l]ease for purposes of finding that [the Suttons'] untimely exercise of the early termination clause was not a material breach, including the prior abandonment of the [l]eased [p]remises with [the Deaktors'] written consent under Paragraph 18(D) and [the Suttons'] withholding of rent, which are both express forms of default under the [l]ease and, as such, material breaches"). The Deaktors do not point us to where they advanced this argument below, and our review of the record indicates that they did not specifically raise it in their Rule 1925(b) statement or post-trial motion. See Pa.R.A.P. 2117(c) (requiring, where an issue is not reviewable on appeal unless raised or preserved below, a statement of place of raising or preservation of issues); Pa.R.A.P. 2119(e) ("Where under the applicable law an issue is not reviewable on appeal unless raised or preserved below, the argument must set forth, in immediate connection therewith or in a footnote thereto, either a specific cross-reference to the page or pages of the statement of the case which set forth the information relating thereto as required by Pa.R.A.P. 2117(c), or substantially the same information"); see also Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the [Rule 1925(b) s]tatement … are waived."); Greater Erie Indus. Development Corp. v. Presque Isle Downs, Inc., 88 A.3d 222, 225 (Pa. Super. 2014) ("[I]n determining whether an appellant has waived his issues on appeal based on non-compliance with [Rule] 1925, it is the trial court's order that triggers an appellant's obligation[;] … therefore, we look first to the language of that order.") (citations omitted); Trial Court Order, 8/15/19, at ¶ 3 ("Any issue not properly included in the Concise Statement of the Errors Complained of on Appeal … shall be deemed waived."); L.B. Foster Co. v. Lane Enterprises, Inc., 710 A.2d 55, 55 (Pa. 1998) ("If an issue has not been raised in a post-trial motion, it is waived for appeal purposes.") (citations omitted).

requisite materiality analysis set forth therein and committed [an] error of law in purportedly applying this framework solely to [the Deaktors,] even though [the Suttons] were shown at [t]rial to be in default of the [l]ease on several bases...." Deaktors' Brief at 45.[10] They say that the Suttons "unilaterally vacated the [l]eased [p]remises, resulting in [the Deaktors'] unrefuted loss of rents from July 2016 ... [to] the remainder of [the Suttons' l]ease's [t]erm through April 30, 2017." Id. at 46. The Deaktors insist they "should be entitled to the benefit of their bargain as the unpaid rents represent actual losses." Id.

This Court has explained that, "if the breach is an immaterial failure of performance, and the contract was substantially performed, the contract remains effective.... In other words, the non-breaching party does not have a right to suspend performance if the breach is not material." International Diamond, 40 A.3d at 1271 (citations and internal quotation marks omitted). Further,

> [e]stablishing "materiality" requires a substantial showing. To determine materiality, Pennsylvania courts refer to the Restatement (Second) of Contracts § 241 (1981), which sets forth the following factors to guide the inquiry:

---

[10] The Deaktors do not specify in what other ways the Suttons were in default. However, to the extent they are referring to the Suttons' abandoning the premises without consent and withholding rent, we reiterate that the Deaktors have waived such claims. Again, the Deaktors do not point us to where they raised this argument below, and our review of the record demonstrates that they did not raise it in their Rule 1925(b) statement or post-trial motion. See footnote 9, supra.

a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

b) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;

c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.

Id. (internal citations omitted). In addition, "we and other courts consistently have treated inquiries into the materiality of a given breach as fact questions rather than questions of law to be decided from the bench." Id. at 1272 (citations omitted).

Though the trial court did not refer to the Section 241 factors, its analysis nevertheless weighs many of them. With respect to the first and second factors, the trial court recognized that the lease contained an early termination provision that permitted the Suttons to end their lease early. Given that provision, the Deaktors knew that the lease afforded some flexibility to the Suttons and did not necessarily require them to stay through the end of the lease's term. Thus, it is unreasonable for the Deaktors to expect to receive unpaid rent payments through the remainder of the lease term. Further, although the Suttons did not formally offer to fulfill all of the requirements of the early termination clause until August 5, 2016, the

Deaktors do not point to any benefit they lost because the Suttons tried to satisfy all of the requirements then, instead of in June. See TCO at 6 ("The Deaktors … identify no loss to them from the formal offer to fulfill the early termination clause being thirty-five days late.").[11] Regarding the third factor, if we treat their untimely invocation of the early termination clause as a material breach, the Suttons would forfeit tens of thousands of dollars for a place they cannot safely live in because it makes their daughter sick. Concerning the fourth factor, the trial court credited Ms. Sutton's testimony that they were prepared to pay the Deaktors $25,000 to be released from the lease, and it observed that the Suttons' counsel contacted the Deaktors about terminating the lease and negotiating a settlement. Id. In addition, Ms. Sutton testified that she had placed their July rent payment in an escrow

_____

[11] Regarding the Suttons' August 5, 2016 offer, Ms. Deaktor testified to the following at trial:

> [The Deaktors' Counsel:] [D]o you understand that this [letter from the Suttons' attorney] is an attempt on August 5, 2016[,] to now invoke the early termination provision of the lease?
>
> [Ms. Deaktor:] I do.
>
> [The Deaktors' Counsel:] Okay. Were you willing to agree to allow the Suttons to invoke the early termination provisions of the lease on August 5th or thereafter?
>
> [Ms. Deaktor:] Prior to August 5th, not August 5th or after.

N.T. Trial, 3/27/19-3/28/19, at 232. Ms. Deaktor proffered no specific explanation as to why she would have agreed on or prior to August 4, 2016, but would not agree on August 5, 2016 or thereafter. Based on our review of the record, the date of August 5, 2016, bears no significance warranting Ms. Deaktor's refusal on or after that date.

account. N.T. Trial, 3/27/19-3/28/19, at 395. As such, the evidence indicated that the Suttons would cure their failure to fulfill all of the requirements of the early termination provision. Finally, the trial court found that the Suttons' intention was not to default, and that their 35-day delay in formally invoking the early termination clause was not willful, but instead because they had to hire an attorney to decipher the lease for them. TCO at 5-6. Thus, we conclude that the record supports the trial court's finding that the Suttons' untimely and imperfect exercise of the early termination provision was not a material breach. Accordingly, the Deaktors' first issue warrants no relief.

## Second Issue

In the Deaktors' second issue, they advance that the trial court abused its discretion and erred as a matter of law in finding violations of the UTPCPL. See Deaktors' Brief at 46. They raise multiple arguments challenging the trial court's findings.

### Identifying and Proving UTPCPL Violations

To begin, the Deaktors declare that the Suttons did not identify or prove a specific provision of the UTPCPL that the Deaktors violated. Id. at 46-47.

In addressing this claim, the trial court explained:

The Deaktors … contend the Suttons, in their Counterclaim, Bench Memo and closing argument at trial, did not identify "a single one of the 22 potential" [UTPCPL] violations. This is incorrect as paragraph no. 111 of the Suttons' March 13, 2017 Counterclaim identifies three potential UTPCPL violations, including the "catch-all" violation of "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi). Additionally, during [the Suttons'] closing argument at trial, counsel implicitly

- 18 -

referenced catch-all violations and even specifically used the terms "fraudulent damages" and "fraud and ... false misrepresented damages." [N.T. Trial, 4/18/19, at] 57-58.

The Deaktors also contend the Suttons did not prove there were any violations of the UTPCPL. This too is incorrect as there was proof of at least three violations of the UTPCPL. First, Ms. Sutton credibly testified to informing the landlord about their asthma issue before signing the lease ([N.T. Trial, 3/27/19-3/28/19, at] 373-[7]4)[,] and Ms. Deaktor saying the air quality is good ([N.T. Trial, 4/18/19, at] 34-45). Ms. Sutton also credibly testified to a statement by Dave Rodgers, the landlord's truthful and "most trusted foreman," ([N.T. Trial, 3/27/19-3/28/19, at] 175[,] 348) that "the windows have been leaking forever." [Id. at] 387. The wood around the windows was rotting from the moisture, but the rotted wood had been painted over. [Id. at] 391. Not informing the Suttons of the water infiltration problem and saying the air quality is good, when Ms. Deaktor knew of the Suttons' asthma, is fraudulent and deceptive. Second, after receiving the Suttons' email saying it was critical for them to move and requesting to be released from the lease, Ms. Deaktor did not either outline the terms of the early termination provision or at least reference a page or paragraph number in the lease. In fact, her response instead describes the Suttons' proposal as "default," which creates the impression the Suttons will not be released before the expiration of the lease term. Such conduct is deceptive. Third, pursuant to 68 P.S. § 250.512 in the Pennsylvania Landlord and Tenant Act, on August 15, 2016[,] the Deaktors sent the Suttons a list of charges for sixteen items they falsely claimed to have been damaged by the Suttons. See Deaktors' [E]xhibit 5. I determined the Deaktors['] claims were false from the credible testimony of Lisa Hobbs, the owner of Host Professional Cleaning Service, and Beth Sutton. See [N.T. Trial, 3/27/19-3/28/19, at] 234-[]83 and 414-[]15. Thus, the Suttons proved at least three instances of fraudulent or deceptive conduct that violated the UTPCPL.

TCO at 6-8 (some internal citations omitted).

In crafting their argument, the Deaktors do not specifically address the trial court's observation that paragraph number 111 of the Suttons' counterclaim identifies three potential UTPCPL violations, and the Deaktors do

not explain why the Suttons' references to "fraud" and "false misrepresented damages" in their closing argument are insufficient as a means of identifying the UTPCPL violations.[12]  The Deaktors also provide no legal authority addressing the way in which parties must identify and pursue claims in litigation, and how specific they must be in doing so.  In re M.Z.T.M.W., 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority.") (citations omitted); Coulter v. Ramsden, 94 A.3d 1080, 1088-89 (Pa. Super. 2014) ("The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority.  … This Court will not act as counsel and will not develop arguments on behalf of an appellant.") (internal quotation marks and citations omitted).  Accordingly, without a developed argument, we cannot agree with the Deaktors that

_____

[12] We add that the Suttons also asserted in their counterclaim that "[b]oth before and after the execution of the [l]ease, and in specific response to the Suttons['] stated concerns regarding air quality due to the asthmatic conditions of the children and M[s]. Sutton, the Deaktors represented to the Suttons that the [l]eased [p]remises was in a safe and healthy condition and contained good air quality."  Suttons' Amended Answer, New Matter, and Counterclaim, 3/13/17, at ¶ 115.  The Suttons also alleged in their counterclaim that "[t]he above-referenced representations were knowingly false when made and were made by the Deaktors with the intent to defraud the Suttons and induce them into executing the Lease and/or refrain from vacating the Leased Premises[,]" and that "[t]he Deaktors['] overall conduct throughout the course of this relationship constituted fraudulent or deceptive conduct which misled the Suttons, and intentionally caused confusion and misunderstanding on the part of the Suttons."  Id. at ¶¶ 117, 124.

"[n]othing of record indicates [the Suttons] specifically identified a single one of the twenty-one (21) potential bases [of the UTPCPL], which [the Deaktors] were alleged to have violated." Deaktors' Brief at 47.

We also deem meritless the Deaktors' argument that the Suttons did not prove that the Deaktors violated the UTPCPL. First, the Deaktors contest the trial court's finding that Ms. Deaktor did not inform the Suttons of the water infiltration problem and said the air quality was good, when Ms. Deaktor knew of the Suttons' asthma. The Deaktors argue that Ms. Sutton "vaguely testified that '[p]rior to signing the lease[,'] she or her husband informed 'the landlord about the asthma issue that [she] and [her] children experienced' and that her husband 'Kevin spoke to [Ms.] Deaktor.'" Id. at 48 (emphasis in original; internal citations omitted; some brackets added). The Deaktors also maintain that the air quality was good, given that "[n]one of the [Suttons] with normal sensitivities had any respiratory problems and the [t]rial [c]ourt declined to find the [l]eased [p]remises were uninhabitable." Id. With respect to the water infiltration problem, the Deaktors claim that they replaced windows in the leased premises, and that the foreman who told Ms. Sutton that the windows had been leaking forever made other representations that Ms. Sutton was mistaken in believing. Id. at 48-49.

We reject the Deaktors' argument. Viewing the evidence in the light most favorable to the Suttons as the verdict winner, see Gamesa Energy USA, LLC, 181 A.3d at 1191-92, the record supports that the Suttons told Ms. Deaktor about their family's asthma issues, N.T. Trial, 3/27/19-3/28/19, at

373-74, the windows in the at-issue property had been leaking during rainfalls for a long time, id. at 387-88, and the wood around the windows was rotting but had been painted over, id. at 109, 391. The record also demonstrates that the presence of rotting wood is clearly an indicator of the potential presence of mold, id. at 109, mold grows when mold spores drop on places where there is excessive moisture, such as leaking windows, id. at 91-92, large mold infestations usually can be smelled and mildew smells typically come from mold, id. at 92-93, 120-21, the property — according to professional cleaner, Lisa Hobbs — had "a mold, mildewy smell[,]" id. at 243, and having water dripping down a wall or window is obviously not a good idea no matter what the situation is, let alone for individuals with asthma and allergies. Id. at 167; see also id. at 79-81, 120 (the Deaktors' mold expert acknowledging that black mold was present in the June 24th air samples and stating that the lab report indicates a "relatively low infestation" of mold); id. at 90 (the Deaktors' mold expert agreeing that asthma symptoms in people with asthma have been linked to mold exposure); id. at 97 (the Deaktors' mold expert agreeing that water infiltration in a home causes mold); see also TCO at 2 (stating that the Deaktors knew, or should have known, that leaky windows and rotting wood produce mold and poor air quality). Further, the Suttons pointed out at trial that the Deaktors did not deny in their answer to the Sutton's counterclaim that, during the lease negotiation period, the Suttons informed them that Ms. Sutton and her children suffered acute and severe asthma, and were susceptible to deteriorating health conditions in

areas of low air quality. N.T. Trial, 3/27/19-3/28/19, at 319-20; see also Suttons' Brief at 10; Deaktors' Reply to New Matter and Counterclaim, 4/3/17, at ¶ 64 ("By way of further response, [the Suttons] informed the [Deaktors] of ... Ms. Sutton's and her children's[] asthma.").[13, 14] Nevertheless, the Deaktors concealed the water infiltration problem and led the Suttons to believe that the property would be safe for their family. Accordingly, we conclude that the record supports the trial court's finding that the Deaktors violated the UTPCPL in this regard.[15]

Second, relating to Ms. Deaktor's response to the Suttons' email requesting to be released from the lease, the Deaktors argue that Ms. Deaktor's identifying the Suttons' request to vacate as a default cannot be deceptive because the early termination clause is "listed under Paragraph 18 as a defined and enumerated form of 'default' under the [l]ease; thus, the representation cannot possibly create 'a likelihood of confusion or of misunderstanding.' This is exactly what the [l]ease says." Deaktors' Brief at

_____

[13] When Ms. Deaktor was asked at trial if Mr. Sutton had told her prior to signing the lease that his family had asthma, Ms. Deaktor testified that she did not recall. N.T. Trial, 3/27/19-3/28/19, at 319.

[14] All citations herein to the Suttons' brief refer to their amended brief filed on June 20, 2020.

[15] To the extent the Deaktors ask us to re-weigh the evidence and make credibility determinations, we reiterate that "[i]ssues of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determination or substitute our judgment for that of the fact finder." Gamesa Energy USA, LLC, 181 A.2d at 1192 (citation omitted).

49. However, as the trial court observed, Ms. Deaktor did not mention the terms of the early termination provision or reference the page or paragraph number in the lease containing that provision. TCO at 7. Additionally, we agree with the trial court that the term 'default' and the language in Ms. Deaktor's email give the impression that the Suttons would not be released early from the lease. Id. We also add that Ms. Deaktor had told the Suttons over the phone that it was an 'ironclad' lease, they were not getting out of it, and they would have to pay at least $25,000 if they want to terminate it early, which are all false and/or misleading statements. See id. at 5. Thus, we conclude that the record supports the trial court's finding that Ms. Deaktor's conduct in this regard violated the UTPCPL.

Third, the Suttons proved that the Deaktors sent the Suttons a list of charges for sixteen items that they falsely claimed the Suttons damaged. At trial, Lisa Hobbs — a professional cleaner hired by the Suttons to clean the property after they moved out — testified that she cleaned various items that the Deaktors alleged were dirty or damaged. See, e.g., N.T. Trial, 3/27/19-3/28/19, at 247-48, 250, 254-55. Nevertheless, the Deaktors argue that "[Ms.] Hobbs admitted that she did not follow the 'Vacating Procedures' in the [l]ease, and [Ms.] Deaktor provided notes from a video walkthrough of the [l]eased [p]remises following [Ms.] Hobbs'[s] cleaning and testified that the itemized list of damages was accurate." Deaktors' Brief at 49.[16] The Deaktors'

---

[16] Ms. Deaktor, however, did not introduce this video at trial. See Suttons' Brief at 16.

argument urges us to reweigh the evidence, which we may not do. See Gamesa Energy USA, LLC, 181 A.3d at 1191-92. Because the record supports the trial court's finding that the Deaktors violated the UTPCPL by falsely claiming that the Suttons had damaged items, no relief is due on this basis.

### UTPCPL Damages

The Deaktors next insist that the trial court abused its discretion and erred as a matter of law "in awarding damages to [the Suttons] because [the Suttons'] private claim is not actionable under the UTPCPL as [the Suttons] failed to prove the existence of any condition of the [l]eased [p]remises that resulted in any loss as a result of a method, act or practice declared unlawful by the UTPCPL." Deaktors' Brief at 50. They maintain that the Suttons "did not prove that they suffered any harm 'as a result' of a violation of the UTPCPL." Id. at 51. More specifically, the Deaktors say that the Suttons "did not present substantial or any evidence that the air quality of the [l]eased [p]remises caused the [l]eased [p]remises to be uninhabitable or was otherwise contrary to any representations by [the Deaktors]." Id. (emphasis in original). They claim that they "proved that the air quality of the [l]eased [p]remises was perfectly fine to persons of normal sensitivities who lived in the [l]eased [p]remises," id. at 52, and point out that none of the medical records for the Suttons' youngest daughter attribute her breathing issues to the leased premises. Id. at 52-53. In addition, the Deaktors advance that the Suttons "did not bother to even introduce the [l]aboratory [r]eport [from

their mold test] as an exhibit in their case or present the author or any expert to interpret the information contained therein because the report wholly disproved [their] mistaken beliefs about the air quality of the [l]eased [p]remises and undermined their entire case." Id. at 53-54.

Here, in response to this claim, the trial court opined:

The Deaktors ... contend that I made an error by awarding UTPCPL damages to the Suttons when the Suttons suffered no losses as a result of UTPCPL violations. A description of each component of my $20,303.06 UTPCPL verdict in favor of the Suttons is necessary for analysis of this contention. With the UTPCPL allowing for up to three times the amount of the actual damages (see 73 P.S. § 201-9.2(a)), $20,303.06 is double the Suttons' actual damages of $10,151.53. The actual damages of $10,151.53 are comprised of a $9,333.95 payment the Suttons made to move their furniture and other personalty to a home they rented in Aspinwall, a $467.58 payment the Suttons made for a hotel room in Pittsburgh they occupied on June 29 and 30, 2016[,] and the $350 payment they made to Host Professional Cleaning Service for the cleaning of 709 Copeland Street after their furniture and other personalty was moved out.

Contrary to the Deaktors' contention, each of these expenditures is an ascertainable loss of money "as a result of the use" by the Deaktors of a practice prohibited under 73 P.S. § 201-2(4) of the UTPCPL. Had the air quality been good, the [Suttons] would not have needed to hire a mover to relocate all of their belongings. Therefore, the $9,333.95 moving expense resulted from the Deaktors' fraudulent and deceptive representation about the townhome's air quality as well as concealment of the water infiltration. Similarly, the hotel expense was incurred due to the same UT[P]CPL violations by the Deaktors. Finally, because the Deaktors falsely claimed the Suttons damaged sixteen items in the townhome, including leaving an unclean stove top and oven, unclean cabinet drawers and toilet cleaner rings, the $350 cleaning expense was of no value to the Suttons. Therefore, I correctly determined the losses suffered by the Suttons resulted from the Deaktors' UTPCPL violations.

TCO at 9-10 (footnote and most internal citations omitted).

We see no error of law or abuse of discretion in the trial court's reasoning. Viewing the evidence in the light most favorable to the Suttons as the verdict winner, the record supports the trial court's determination that the Deaktors knew of the Sutton family's asthma issues, and knew that the windows had been leaking for a long time and that the wood around them was rotting, yet they did not tell the Suttons about this and actively concealed the water infiltration issues by painting over the rotted wood. Had the Deaktors disclosed this issue, the Suttons could have decided whether to rent the property given the water infiltration and their family's breathing troubles. Instead, the Deaktors misled them by concealing the water infiltration, which caused the Suttons to have to stay at a hotel and move to another property due to the air quality. Ms. Sutton testified that her and her youngest daughter's breathing difficulties subsided when they left the property. See N.T. Trial, 3/27/19-3/28/19, at 378-80. Thus, given our standard of review, the record supports the trial court's damages award and no relief is due on this basis.

### Pre-Lease Representations

The Deaktors also claim that the trial court abused its discretion and committed an error of law "in finding purported fraudulent pre-lease parol evidence representations supported [the Suttons'] claims under the UTPCPL." Deaktors' Brief at 56 (unnecessary capitalization and emphasis omitted). They aver that any purported fraudulent or deceptive representations made

by the Deaktors prior to the signing of the lease are barred by the lease's integration clause and the parol evidence rule. Id.

The trial court determined that the Deaktors had waived this claim, stating, "I am unable to find that the Deaktors raised this issue in a pre-trial proceeding or at trial. I cannot locate a pre-trial motion or any objection during trial based on the parol[] evidence rule. This results in the argument being waived." TCO at 8 (citation omitted); see also Pa.R.C.P. 227.1(b)(1) ("[P]ost-trial relief may not be granted unless the grounds therefor, (1) if then available, were raised in pre-trial proceedings or by motion, objection, point for charge, request for findings of fact or conclusions of law, offer of proof or other appropriate method at trial…."); Suttons' Brief at 25 ("At no point during the trial did [the Deaktors] make a timely objection to the admissibility of the testimony and evidence concerning [their] pre-[l]ease false representations that induced the Suttons to sign the [l]ease."). On appeal, the Deaktors aver that, "[a]t [t]rial and in numerous filings, [the Deaktors] asserted the content of Paragraph 26 [of the lease] as an integration clause, which necessarily embraces the parol evidence rule relative to [the Suttons'] seeking to vary the terms of the agreement and any attempt of [the Suttons] to admit parol evidence to establish any purported fraud in the inducement on behalf of [the Deaktors]. As such, the parol evidence doctrine was preserved." Deaktors' Brief at 57 (emphasis in original; footnote omitted).

We deem the Deaktors' parol evidence claim waived. Though they insist that they sufficiently preserved this claim at trial and in numerous filings by

characterizing Paragraph 26 of the lease as an integration clause, they do not indicate where they purportedly did so, which contravenes our Rules of Appellate Procedure. See Pa.R.A.P. 2117(c) (requiring, where an issue is not reviewable on appeal unless raised or preserved below, a statement of place of raising or preservation of issues); Pa.R.A.P. 2119(e) ("Where under the applicable law an issue is not reviewable on appeal unless raised or preserved below, the argument must set forth, in immediate connection therewith or in a footnote thereto, either a specific cross-reference to the page or pages of the statement of the case which set forth the information relating thereto as required by Pa.R.A.P. 2117(c), or substantially the same information"). "Our appellate courts have long held that an [appellant] who does not follow Pa.R.A.P. 2117(c) and Pa.R.A.P. 2119(e) waives the related issues due to the defects in his brief." Young v. S.B. Conrad, Inc., 216 A.3d 267, 274 (Pa. Super. 2019). "[I]t is not the responsibility of this Court to scour the record to prove that an appellant has raised an issue before the trial court, thereby preserving it for appellate review." Commonwealth v. Baker, 963 A.2d 495, 502 n.6 (Pa. Super. 2008) (citations omitted). Accordingly, we decline to search the record for the Deaktors to find where they supposedly raised that the lease contained an integration clause that barred the introduction of any evidence of the Deaktors' pre-lease representations relating to water infiltration and air quality. Thus, this claim is waived, and no relief is warranted.

### Third Issue

In the Deaktors' third issue, they argue that the trial court abused its discretion and committed an error of law "by finding in the absence of expert or other competent evidence or testimony that there was mold in the [l]eased [p]remises, which caused respiratory problems to a child of hypersensitivities and was not supported by substantiated evidence." Deaktors' Brief at 36-37. They say that the Suttons "failed to establish their burden of proof by a preponderance of the evidence as they presented no substantial evidence that supports a finding of mold in the [l]eased [p]remises." Id. at 60 (citation omitted).

The Deaktors have also waived this argument. They do not develop an argument to support their claim that the Suttons had to produce an expert in order to prove that the leased premises contained mold, and they do not explain why the evidence of mold already contained in the record was "incompetent" and should not be considered under relevant law. See Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."); In re M.Z.T.M.W., 163 A.3d at 465 ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority.") (citations omitted). Thus, no relief is due on this basis.

## The Suttons' Cross-Appeal

We now turn to the Suttons' cross-appeal.  They present the following issues for our review:

> 1. Whether the [t]rial [c]ourt abused its discretion and/or erred as [a] matter of law in awarding any damages to the [Deaktors,] who the [t]rial [c]ourt found made knowingly false misrepresentations about the condition of the [p]roperty, actively concealed latent water infiltration, committed fraud during the pendency and termination of the [l]ease, and violated the [UTPCPL.]
>
> 2. Whether the [t]rial [c]ourt abused its discretion and erred as [a] matter of law in failing to award the [Suttons] the repayment of rent and security deposits paid by them under the [l]ease (and failing to treble those damages as part of the UTPCPL award), and otherwise failing to find in favor of the Suttons on Counts 1, 2[,] and 4 of the [c]ounter[]claim.
>
> 3. Whether the [t]rial [c]ourt erred as [a] matter of law and abused its discretion in awarding attorney[s'] fees to the [Deaktors], or in the alternative, awarding an amount of attorneys' fees that was not "reasonable."
>
> 4. Whether the [t]rial [c]ourt abused its discretion and erred as a matter of law in failing to award the Suttons the full amount of their reasonable attorney[s'] fees, costs[,] and expenses in pursuing and prevailing upon their UTPCPL claims.

Suttons' Brief at 4-5.[17]

At the outset, we observe that the Suttons raise four issues in their statement of the questions involved.  However, the Suttons do not divide the argument section of their brief into four corresponding parts; instead, they separate it into five, incongruous sections.  We admonish the Suttons for their lack of compliance with Pa.R.A.P. 2119(a).  See Pa.R.A.P. 2119(a), supra; Donaldson v. Davidson Bros., Inc., 144 A.3d 93, 99 n.9 (Pa. Super. 2016)

_____

[17] We have re-ordered the Suttons' issues for ease of disposition.

(determining that the appellant failed to comply with Rule 2119(a) where the appellant's brief did not "present and develop eight arguments in support of the eight questions raised"). Notwithstanding, the Suttons' noncompliance does not preclude our review of their issues.

## First Issue

In the Suttons' first issue, they argue that the trial court abused its discretion and/or erred as a matter of law "in awarding any damages to the [Deaktors,] who the [t]rial [c]ourt found made knowingly false misrepresentations about the condition of the [p]roperty, actively concealed latent water infiltration, committed fraud during the pendency and termination of the [l]ease, and violated the [UTPCPL.]" Suttons' Brief at 4. The Suttons advance that the trial court's "factual findings demonstrate that [they] established the defense of fraud sufficient to preclude any liability for alleged breach of the [l]ease." Id. at 32-33. To support the proposition that fraud constitutes a total defense to breach-of-contract claims, they provide the following legal authority:

> Fraud in the execution of the [l]ease serves as an absolute defense to the [Deaktors'] breach of contract claims. See Germantown Mfg. Co. v. Rawlinson, 491 A.2d 138, 141 (Pa. Super. … 1985) ("The recipient of a misrepresentation may avoid the contract by showing that the misrepresentation was either fraudulent or material."); [s]ee also Owens v. McCurdy, 450 A.2d 1028, 1029 n.1 ([Pa. Super. 1982) (referring to fraud in the inducement as a meritorious defense).

Suttons' Brief at 31.

We deem this claim waived. While the Suttons proffer this authority to establish that fraud precludes liability for breach-of-contract claims, their argument lacks any meaningful discussion or analysis of it. Instead, the Suttons' references to these authorities are vague, and their reliance on them unexplained. We will not examine and analyze these cases for them. See Coulter, 94 A.3d at 1088 ("We need not reach the merits of this issue because the argument section of [the a]ppellant's brief merely consists of general statements unsupported by any discussion and analysis of relevant legal authority."). Therefore, we award the Suttons no relief on their first claim.

## Second Issue

In the Suttons' second issue, they insist that the trial court abused its discretion and erred "in failing to award the [Suttons] the repayment of rent and security deposits paid by them under the [l]ease (and failing to treble those damages as part of the UTPCPL award), and otherwise failing to find in favor of the Suttons on Counts 1, 2[,] and 4 of the [c]ounter[]claim." Suttons' Brief at 5. First, with respect to trial court's failure to award the Suttons the total amount of rent they paid and their security deposit, they assert that they are "entitled to all money damages incurred as a result of the [Deaktors'] fraudulent conduct, which includes not only the moving, cleaning, and hotel expenses, but also the reimbursement of rent and security deposits paid to the [Deaktors'] under the lease." Id. at 33 (citation omitted). The Suttons claim that this sum amounts to $15,900. Id.

Here, in denying this claim, the trial court reasoned:

> The Suttons are entitled "to recover actual damages" that are the "result of the use or employment by any person of a method, act or practice" that violates the UTPCPL. 73 P.S. § 201-9.2(a). The Suttons' moving, hotel and cleaning expenses … were a result of the Deaktors' deceptive conduct. The security deposit and two months['] rent paid to the Deaktors were not losses that were a result of the Deaktors' deception. Instead, this was money spent to occupy a townhome habitable by people of ordinary sensitivities for three months. Had the Deaktors disclosed the water infiltration problem, it is possible the Suttons may have taken a "wait and see approach" and still rented the townhome. Had the Deaktors disclosed the water infiltration problem and the Suttons decided not to sign the lease, they would have then rented elsewhere at a similar cost. Hence, the Suttons would have spent the $15,900 whether there was, or was not, deceptive behavior. Therefore, my decision not to award the Suttons the $15,900 they paid to the Deaktors was correct.

TCO at 15-16. The Suttons have not persuaded us that the trial court erred or abused its discretion in this regard, as they proffer a less-than-one-page argument that includes no citations to, or discussion of, relevant legal authority. They also do not specifically counter any of the points made in the trial court's analysis. Without any legal analysis detailing how the trial court erred, we decline to disturb the trial court's decision on this matter. See Pa.R.A.P. 2119(a), supra.

Second, the Suttons argue that the trial court erred in failing to find the Deaktors liable for breach of contract and breach of the implied warranty of habitability. See Suttons' Brief at 34.[18] They claim that the trial court's findings concerning persistent latent water infiltration in the bedroom of the

_____

[18] In the argument section of the Suttons' brief, they do not challenge the trial court's findings regarding Count IV of their counterclaim concerning violations of the Landlord Tenant Act. Given the lack of argument on Count IV, we do not address it.

leased premises and the presence of toxic black mold demonstrate that the Deaktors breached the implied warranty of habitability and the lease. Id. at 37. As a result, they insist that the trial court should have awarded them the $15,900.00 of rent and security deposits that they paid to the Deaktors. Id. We disagree.

With respect to the implied warranty of habitability, our Supreme Court has explained:

> The implied warranty is designed to insure that a landlord will provide facilities and services vital to the life, health, and safety of the tenant and to the use of the premises for residential purposes. This warranty is applicable both at the beginning of the lease and throughout its duration.
>
> In order to constitute a breach of the warranty[,] the defect must be of a nature and kind which will prevent the use of the dwelling for its intended purpose to provide premises fit for habitation by its dwellers. At a minimum, this means the premises must be safe and sanitary of course, there is no obligation on the part of the landlord to supply a perfect or aesthetically pleasing dwelling. Materiality of the breach is a question of fact to be decided by the trier of fact on a case-by-case basis. Several factors (not exclusive) are listed by the Superior Court as considerations in determining materiality, including the existence of housing code violations and the nature, seriousness and duration of the defect.[19]

_____

[19] Specifically, this Court stated that,

> [a]mong those factors to be considered in determining whether a breach is material are 1) whether the condition violates a housing law, regulation or ordinance; 2) the nature and seriousness of the defect; 3) the effect of the defect on safety and sanitation; 4) the length of time for which the condition has persisted; and 5) the age of the structure. This proposed list of factors is not designed

We believe these standards fully capable of guiding the fact finder in his determination of materiality of the breach. Further, these standards are flexible enough to allow the gradual development of the habitability doctrine in the best common law tradition. This finds support in Elderkin v. Gaster, [288 A.2d 771 (Pa. 1972)], wherein we declined to establish rigid standards for determining habitability and its breach in the builder/vendor vendee context and, instead, defined habitability in terms of "contemporary community standards" and breach of the warranty as whether the defect prevented the use of the dwelling for the purposes intended habitation. [Id.] at 777. In that case, we held that lack of a potable water supply to the home prevented its use as habitation and, accordingly, found the implied warranty of habitability to have been breached.

Additionally, we agree with the Superior Court that, to assert a breach of the implied warranty of habitability, a tenant must prove he or she gave notice to the landlord of the defect or condition, that he (the landlord) had a reasonable opportunity to make the necessary repairs, and that he failed to do so.

Pugh v. Holmes, 405 A.2d 897, 905-06 (Pa. 1979) (most internal citations and quotation marks omitted; emphasis added). Further, we recognize that "[t]he tenant may vacate the premises where the landlord materially breaches the implied warranty of habitability.... Surrender of possession by the tenant would terminate his obligation to pay rent under the lease." Id. at 907

Here, the trial court discerned that "[t]he Suttons were required to relocate because one of their daughters is extraordinarily sensitive to moisture and/or mold in the air. Mr. Sutton reported no problems and Ms. Sutton did not have any severe reaction. The Deaktors provided a townhome that was habitable by persons of ordinary sensibilities...." TCO at 13. The trial court

_____

to be exclusive; the lower court, in its discretion, may consider any other factors it deems appropriate.

Pugh v. Holmes, 384 A.2d 1234, 1240 (Pa. Super. 1978).

went on to determine that "a breach of the warranty of habitability does not arise from a condition that impacts only one resident who has extraordinary sensitivities." Id. Thus, the trial court found that the seriousness and effect of the water infiltration did not make the premises unfit for habitation.

Given our standard of review and our Supreme Court's pronouncement in Pugh that the materiality of the breach is a question of fact to be decided by the trier of fact on a case-by-case basis, we uphold the trial court's conclusion. See Gamesa Energy USA, LLC, 181 A.3d at 1191 ("The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of the jury."). The record supports the trial court's finding that persons with ordinary sensibilities had no problems in the townhome. N.T. Trial, 3/27/19-3/28/19, at 446-47 (Ms. Sutton's testifying that Mr. Sutton and her older daughter had no respiratory issues and were perfectly fine while living at the property); id. at 33 (Ms. Deaktor's testifying that no tenant at the property in the twelve years preceding the Suttons' tenancy had brought to her attention any water penetration issues). Further, to the extent that the Suttons argue that this Court has ascertained that water infiltration breached the implied warranty of habitability in other cases, we point out that in those cases, this Court was affirming the fact-finder's finding in that regard. See Suttons' Brief at 35 (citing to Krishnan v. Cutler Group, Inc., 171 A.3d 856 (Pa. Super. 2017); Ecksel v. Orleans Const. Co., 519 A.2d 1021 (Pa. Super. 1987)). Therefore, based on the foregoing, the Suttons' second issue fails.

Third Issue

In the Suttons' third issue, they assert that the trial court "erred as a matter of law and abused its discretion in awarding attorney[s'] fees to the [Deaktors], or in the alternative, awarding an amount of attorneys' fees that were not 'reasonable.'" Suttons' Brief at 5. Initially, the Suttons claim that, pursuant to Paragraph 19(F) of the lease, the Deaktors are only entitled to the payment of reasonable attorneys' fees and costs in the event that the Deaktors prevail in court. Id. at 37. However, the Suttons aver that the Deaktors did not prevail on any of their claims against them and, therefore, should not receive attorneys' fees. Id.

We set forth, again, Paragraph 19 of the lease, which outlines the Deaktors' remedies. It provides, verbatim:

19. REMEDIES

On a violation of any provision of this LEASE by TENANT, LANDLORD, without prior notice to quit, can;

A.) Declare this LEASE terminated;

B.) Sue to evict TENANT, obtain possession of the LEASED PROPERTY and recover the court costs and attorney fees incurred;

C.) Declare the unpaid balance of the TOTAL RENT immediately due and payable and collect the unpaid TOTAL RENT, ADDITIONAL RENT, and LATE CHARGES;

D.) Collect any damages caused by TENANT's failure to do any of TENANT's other obligations under this LEASE;

E.) Sue TENANT to collect the unpaid TOTAL RENT, ADDITIONAL RENT, LATE CHARGES, damages, court costs and attorney fees;

F.) LANDLORD shall be entitled to the payment of reasonable attorney's fees and costs in the event that

> LANDLORD prevails in Court on any action arising out of the LEASE;
>
> G.) Any legal action arising out of the LEASE shall be brought in the Court of Common Pleas of Allegheny County and shall be governed by Pennsylvania law and local Court rules applicable to LANDLORD-TENANT actions;
>
> H.) In an attempt to collect unpaid debts, LANDLORD will report TENANT to Credit Reporting Collection Agency. Agency will attempt to collect debt by any means necessary. TENANT will be responsible to Landlord for all incurred expenses associated with debt collection.

Lease at 4.

> In awarding attorneys' fees to the Deaktors, the trial court explained:
>
> The Suttons ... contend that my award of attorney[s'] fees to the Deaktors in the amount of $40,000 is erroneous. They argue that Paragraph 19F of the lease entitles the Deaktors to attorney[s'] fees only "in the event that Landlord prevails in Court," which they say did not occur. Discussing whether the [Deaktors] prevailed is unnecessary because it is Paragraph 19E of the lease that is applicable. It allows the [Deaktors] to "sue TENANT to collect the unpaid TOTAL RENT… damages, court costs and attorney fees." Hence, the fact that the Deaktors sued the Suttons for unpaid rent authorized me to award attorney[s'] fees to the Deaktors.

TCO at 14 (internal citations omitted).

The Suttons proffer no argument in response to the trial court's reasoning. They make no mention of Paragraph 19(E), or why the trial court was incorrect to look to that provision instead of Paragraph 19(F) in awarding attorneys' fees to the Deaktors. Accord Deaktors' Reply Brief at 22 ("The [t]rial [c]ourt also identified an entirely different provision in the [l]ease that clearly spells out [the Deaktors'] right to attorneys' fees without any contemplation of what the verb 'prevail' may or may not mean. [The Suttons] simply do not address this aspect of the [t]rial [c]ourt's reasoning….") (citation

omitted). The Suttons also do not argue that the remedies in Paragraph 19 should not apply at all because the Deaktors failed to establish an event of default and violation under the lease that would entitle them to use them. We will not develop these arguments and analyses for the Suttons. Coulter, 94 A.3d at 1088-89 ("This Court will not act as counsel and will not develop arguments on behalf of an appellant.") (citations omitted). Thus, we see no error or abuse of discretion by the trial court in awarding attorneys' fees to the Deaktors.

The Suttons also claim that the trial court's award of attorneys' fees to the Deaktors was unreasonable. They say that "the attorney[s'] fees provision of Paragraph 19(F) ... only permits the recovery of 'reasonable' attorney[s'] fees." Suttons' Brief at 40 (emphasis in original). The Suttons insist that any attorneys' fees incurred by the Deaktors on or after the date of the Deaktors' wrongful rejection of the Suttons' exercise of the early termination option were not reasonable and should not be awarded. Id. at 40-41. The Suttons observe that "the results obtained and amount of money awarded to [the Deaktors] in the case is exactly the amount that the Suttons tendered to them on August 15, 2016." Id. at 41. Therefore, they maintain that the trial court erred and abused its discretion "in awarding any attorneys' fees [to the Deaktors] in excess of $3[,]091.00 — the amount incurred prior to August 15, 2016." Id. (citation omitted).

Regarding the reasonableness of the attorneys' fees, the trial court opined:

> The Suttons ... contend that my award of attorney[s'] fees to the Deaktors is not reasonable because it includes attorney time spent after August 15, 2016, "the date of the [Deaktors'] wrongful rejection of the [Suttons'] exercise of the [e]arly [t]ermination option...." In Skurnowicz v. Lucci, [798 A.2d 788 (Pa. Super. 2002) (superseded by statute on other grounds)], the Superior Court of Pennsylvania found [that] a trial judge ... abused his discretion when the only reason stated for a large attorney fee[] award was that [the] defendants' lack of a response to [the] plaintiffs' settlement attempts forced [the plaintiffs] to file suit. [Id.] at 796. Since the Superior Court found this basis for increasing an award "punitive," the same could then be said about reducing an attorney fee[] award because a settlement offer was made. While the Pennsylvania judiciary encourages the resolution of disputes by out-of-court settlement, parties unable to do so should be entitled to have their "day in court" without repercussion. Also, I believe it simply is wrong to penalize an attorney for not making a good guess on the amount of damages the trier of fact will award in the future. Therefore, my decision to award attorney[s'] fees for time spent after the Deaktors rejected the Suttons' exercise of the [e]arly termination option was correct.

TCO at 14-15 (internal citation omitted).

The trial court's explanation for why it rejected the Suttons' theory is rational, and the Suttons offer no argument in response to it. Further, the trial court awarded the Deaktors attorneys' fees pursuant to Paragraph 19(E) of the lease, which does not explicitly require those fees to be 'reasonable.' In light of the foregoing, we affirm the trial court's award of attorneys' fees to the Deaktors, as the Suttons have not convinced us that the trial court committed an error of law or abuse of discretion.

### Fourth Issue

Finally, in the Suttons' fourth issue, they contend that the trial court erred and abused its discretion in reducing their award of attorneys' fees.

- 41 -

Suttons' Brief at 42. The Suttons state that their "billing records indicated [a] total of $44,250.67 in attorney[s'] fees, plus $1,565.23 in costs and expenses[,] incurred as a result of the [Deaktors'] wrongful conduct and violations of the UTPCPL. However, the [t]rial [c]ourt only awarded the Suttons $20,000 in legal fees, representing less than half of the total attorney[s'] fees and none of the documented costs and expenses incurred by them." Id.

"We examine such claims for an abuse of discretion." Krishnan, 171 A.3d at 871 (citation omitted). The UTPCPL provides that "[t]he court may award to the plaintiff … costs and reasonable attorney fees." Id. (citing 73 P.S. § 201–9.2(a); other citation and emphasis omitted). When awarding attorneys' fees under the UTPCPL, this Court has directed that:

> In a case involving a lawsuit which include[s] claims under the UTPCPL … the following factors should be considered when assessing the reasonableness of counsel fees:
>
>> (1) The time and labor required, the novelty and difficulty of the questions involved and the skill requisite properly to conduct the case; (2) The customary charges of the members of the bar for similar services; (3) The amount involved in the controversy and the benefits resulting to the clients from the services; and (4) The contingency or certainty of the compensation.
>
> Further,
>
>> (1) there should be a sense of proportionality between an award of damages [under the UTPCPL] and an award of attorney[s'] fees, and (2) whether plaintiff has pursued other theories of recovery in addition to a UTPCPL claim should [be] given consideration in arriving at an appropriate award of fees.

> We [do] not mandate a proportion that would be the limit of acceptability, but instead only suggest[] that there be a sense of proportionality between the two amounts. Nor would it have been appropriate for this Court to fix a proportionate amount that would define the limit of recoverable fees, since the General Assembly specifically chose not to include such a factor in the statute.

Id. at 900-01 (internal citations and quotation marks omitted).

> Moreover,

> [w]e have stated that a court in awarding attorney[s'] fees under the UTPCPL must ... eliminate from the award of attorney[s'] fees the efforts of counsel to recover on non-UTPCPL theories. Simply put, there is no statutory authority for awarding attorney[s'] fees for the time spent pursuing non-UTPCPL counts. Notwithstanding, this Court has also recognized the difficulty in differentiating the time spent pursuing UTPCPL claims from non-UTPCPL claims. For instance, we have noted that where the plaintiffs are proceeding on multiple theories of relief, including under the UTPCPL, it is difficult to parse out the time between the UTPCPL claim and other causes of action. In such scenarios, [m]uch of the time spent in pre-trial litigation would relate to both UTPCPL and common law causes of action.

Id. at 871 (internal citations and quotation marks omitted).

The Suttons advance that "[i]n this case[,] all of the underlying facts and legal theories of the Suttons' UTPCPL claims are directly and inextricably intertwined with all of the other claims and defenses in the case." Suttons' Brief at 43 (emphasis in original). The Suttons also maintain that the Deaktors "made no effort to establish or even argue any basis for segregating hours and time spent on UTPCPL claims — nor could they." Id. at 44 (citing to Township of South White Hall v. Karoly, 891 A.2d 780, 786 (Pa. Cmwlth. 2006), and Okot v. Conicelli, 180 F.Supp.2d 238 (D. Maine 2002), for the proposition that "once the prevailing party has established the relatedness of the claims, it is the opposing party's 'burden to establish a basis for

segregating the hours spent on the successful and unsuccessful claims'"). Consequently, they say that "the [t]rial [c]ourt erred in failing to award [them] the entirety of the attorneys['] fees and costs as part of their UTPCPL award." Id.

> In addressing this contention, the trial court reasoned:

> The Suttons ... acknowledge that the attorney fee award must exclude their counsel's billings for non-UTPCPL work. In their counterclaim, in addition to the UTPCPL violations, the Suttons pled counts for breach of contract, breach of implied warranty of habitability and violation of the Landlord and Tenant Act. Hence, there can be no question that, within the Suttons['] counsel['s] bills, work for non-UTPCPL claims are included. I also believe the Suttons' counsel devoted half of their efforts to defending against the Deaktors' claims, which also is non-UTPCPL work. By way of example, on 1/9/2018[,] the Suttons' counsel billed them $2,325 to "prepare for and conduct defense of Kevin and Beth Sutton Depositions[,"] and on 3/27/2019[,] $3,187.50[,] and on 3/28/2019[,] another $3,187.50[,] for representation during trial days in which the Deaktors['] witnesses' testimony consumes 285 of the 459 transcript pages. In assessing the reasonableness of counsel fees, "the amount involved in the controversy and the benefits resulting to the clients from the services" must also be considered. The verdict on the counterclaim did not include $15,900 paid to the Deaktors for the security deposit and rent, and the UTPCPL damages were doubled, not tripled. The Suttons unsuccessfully sought these damages, an indication that counsel did not achieve the full benefits sought by their clients. This is additional justification for my decision to award only $20,000 to the Suttons' counsel. Because more than half of counsel's work was for non-UTPCPL claims and the full benefits sought by their clients were not achieved, my decision to award $20,000 to the Suttons for UTPCPL counsel fees was correct.

> The Suttons also argue their UTPCPL claims are inextricably intertwined with their other claims and defenses, hence it is difficult to differentiate time spent by counsel on UTPCPL claims from non-UTPCPL claims and defenses. I agree with the Suttons that this is difficult. However, such difficulty does not justify awarding them an amount of counsel fees far greater than would

- 44 -

be awarded if the dispute involved only the Suttons' UTPCPL claim. To award the Suttons all counsel fees and costs they incurred would provide an undeserved windfall to them while unfairly punishing the Deaktors.

The Suttons also argue the Deaktors had the burden to establish a basis for segregating their attorney fees for non-UTPCPL claims and the Deaktors have waived their ability to do so. However, the[] two cases[ — Township of South Whitehall and Okot — ] cited [by the Suttons] to authorize placing the burden on the Deaktors involved extensive testimony, affidavits and declarations, with the disputes focused exclusively on the issue of attorney fees. The Suttons' attorney fee claim was more similar to the attorney fee claim in Wallace v. Pastore…[, 742 A.2d 1090, 1094 (Pa. Super. 1999)], as the Suttons did nothing more than submit their attorneys' invoices at the conclusion of the trial. The parties implicitly deferred factual determinations and the applicable law to me. Under this scenario, the burden shifting analysis or a finding of waiver are improper.

TCO at 10-12 (internal citation omitted).

The Suttons have not convinced us that the trial court abused its discretion in discounting their attorney fee award. The trial court reasonably weighed that the Suttons' counsel was only partly successful in litigating their UTPCPL claims and spent a lot of time defending the Suttons against the Deaktors' lawsuit. It also considered that it would be unfair to the Deaktors for the Suttons to receive all of the attorneys' fees and costs they incurred in this case. In addition, the trial court distinguished the cases relied on by the Suttons to support their claim that the Deaktors had to establish a basis for separating time spent on UTPCPL claims, and the Suttons make no argument responding to that distinction. Moreover, the cases that the Suttons cited in support of their argument are not binding on us. See Beaston v. Ebersole, 986 A.2d 876, 881 (Pa. Super. 2009) (acknowledging that "decisions rendered

by the Commonwealth Court are not binding on this Court") (citation omitted); Efford v. Jockey Club, 796 A.2d 370, 374 (Pa. Super. 2002) (noting that decisions of the federal district courts are not binding on Pennsylvania courts) (citation omitted). Last, the Deaktors aptly note that the Suttons "cite to no evidence of record that established the threshold issue of the 'relatedness' of all of their claims," and "do nothing to refute their counsel's time spent defending [the Deaktors'] claims, and improperly place the onus on the [the Deaktors] to assert a basis for separating [the Suttons'] legal counsel's billings for UTPCPL and non-UTPCPL claims." Deakotors' Reply Brief at 25, 26. We agree with this observation. Accordingly, based on the foregoing, we discern no abuse of discretion by the trial court in reducing the Suttons' attorneys' fees.

Judgment affirmed.

Judge Musmanno joins this memorandum.

Judge McLaughlin concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/15/2020